[No. 563. Decided September 17, 1892.]

BELLINGHAM BAY LAND COMPANY, *Respondent*, v. CARMI DIBBLE, *Appellant*.

QUIETING TITLE—ADVERSE POSSESSION—PLEADING—EVIDENCE.

In an action to quiet title, testimony on the part of the plaintiff tending to prove adverse possession is admissible under an allegation in the complaint that "the plaintiff and its grantors have been in actual, open and notorious possession of the said property continuously since the 28th day of March, 1862, under color and claim of title; that neither the defendant nor his ancestors or predecessors have been seized or possessed of the premises in question, or any part or parcel thereof, within more than ten years before the date of the commencement of this suit."

In an action to quiet title it was shown that the original grantor and his wife each owned half of a certain tract of land; that the husband executed a deed of the land in his own name and as attorney in fact of his wife to a grantee under whom plaintiff claims by mesne conveyances; that the power of attorney was never placed of record, and was lost; that the grantee under said deed went into possession of said land, paid taxes thereon, leased portions of it, gave permission to various persons to cut timber on it, sold timber

therefrom, and exercised absolute control over the land for more than the statutory period necessary to establish adverse possession, although he did not live thereon, nor fence or cultivate it, the land being chiefly valuable for its timber.    *Held*, That possession adversely to the wife's heirs was sufficiently established.

*Appeal from Superior Court, Whatcom County.*

*Harris, Black & Leaming*, for appellant.

*H. Y. Thompson*, and *J. A. Kerr*, for respondent.

The opinion of the court was delivered by

DUNBAR, J.—The pertinent facts in this case are substantially as follows:

On the 28th day of March, 1862, Thomas Jones and Betsy Jones, his wife, were the owners of a donation claim, described in the complaint, and situated in the county of Whatcom, Territory of Washington, containing 320 acres, the west half having been donated to said Thomas Jones, and the east half to said Betsy Jones, his wife.   On said 28th day of March, 1862, for a valuable consideration, Thomas Jones, for himself, and as attorney in fact for the said Betsy Jones, his wife, by a good and sufficient deed, conveyed the above described tract of land to one Edward Eldridge, which said deed was duly acknowledged and placed upon the records of said Whatcom county and Territory of Washington.   The alleged power of attorney from Betsy Jones to Thomas Jones was not recorded, and could not be and has not been found.   In the acknowledgment in the deed, however, from Thomas and Betsy Jones to Eldridge, the officer who took the acknowledgment certified that the power of attorney from Betsy Jones to Thomas Jones for the sale of said land was at that time exhibited to him.   The plaintiff, the Bellingham Bay Land Company, claimed to have succeeded by chain of mesne conveyances to the title of the said Thomas Jones and Betsy Jones to the land in controvery, and the validity,

of the said mesne conveyances is not called in question.
On the 17th day of May, 1891, certain persons claiming to
be heirs of Betsy Jones deeded to appellant, Carmi Dibble,
the east half of the said donation claim, so that both parties
to the action acknowledge Betsy Jones as the common
source of title.   The deeds of appellant were recorded in
May, 1891, and are alleged to be clouds on the title of
respondent.   An action to remove said clouds was brought
in the court below, which rendered judgment in favor of
respondent.

It is agreed that both Thomas and Betsy Jones had died
before the commencement of this action.   The proof of
two facts was attempted by the respondent, the establish-
ment of either of which would be fatal to appellant's
claim.   The facts attempted to be proven were as follows:
(1) That plaintiff's title to the land in controversy had
been acquired by adverse possession; (2) that Betsy Jones
had executed a power of attorney to her husband, Thomas
Jones, authorizing him to sell the disputed premises.
We will notice the first proposition: It is claimed at the
outset by the appellant that, under the pleadings as framed,
no testimony tending to prove adverse holding is admissi-
ble.   The language of the complaint in this respect is, that
"the plaintiff and its grantors have been in actual, open
and notorious possession of the said property continuously
since the 28th day of March, 1862, under color and claim
of title; that neither the defendant, or his ancestors or
predecessors have been seized or possessed of the premises
in question, or any part or parcel thereof, within more
than ten years before the date of the commencement of
this suit."   We think there is nothing in appellant's ob-
jection.   There is no question but that the possession must
be adverse, and that the adverseness of the possession is the
essential ingredient that ripens into title; and that without
that element the statute would not run.   But there are cer-

tain facts which must be pleaded and proven before the legal conclusion of adverse holding can be announced. It is for the witnesses to testify what the character of the possession was, and from such testimony the legal conclusion is deduced by the court. It is true that some of the text writers in defining a possession that would bar the title of the legal owner enumerate five elements of possession which must co-exist, viz.: (1) Hostile or adverse, (2) actual, (3) visible, notorious and exclusive; (4) continuous, (5) claim or color of title; and yet it is clear that the four last mentioned acts simply constitute and are necessary to constitute adverse possession. Said the court in *Taylor's Devisees v. Burnsides,* 1 Grat. 165:

"When we look to the elements of an adversary possession, in reference to conflicting claims, and the statutory prescriptive bar, we find it to consist of an exclusive, actual, continued possession, under a colorable claim of title."

And such is the accepted doctrine of all the cases. To show conclusively that adverseness is universally regarded as a question of law, and not of fact, the books proceed to discuss the circumstances under which possession would be held to be adverse, or otherwise; as, for instance, it is held that possession will not be adverse if it be held under or subservient to a higher title. In 1 Am. & Eng. Enc. of Law, 229, cited by appellant on this point, it is held that when the purchaser of lands, under an executory contract, is let into possession, not having paid the purchase money, and not having received a conveyance, he holds in subordination to the title of the vendor, and his possession is, therefore, held not to be adverse. Where, however, the vendee has executed his part of the agreement by payment of the purchase money, his possession is from that time adverse to the vendor. So that the question of adverseness is plainly a question of law instead of fact. We think, especially under the provisions of our code which require

only a plain and concise statement of facts constituting a cause of action, that the complaint is sufficient; and even if it were not, this court has repeatedly held that in equity causes where the whole cause was before it, that in the interests of justice it would consider all amendments made to the pleadings that could have been made in the court below. Nor can it work any hardship or surprise in this case, as suggested by the appellant in his reply brief, for the case was tried upon the theory of adverse possession, and the appellant has been industrious in preparing his defense to that proposition to the extent of having surveys made to show that the cabin which the plaintiff testified to having taken possession of was not on the land in controversy.

With this view of the sufficiency of the complaint, the pertinent question then is, did the plaintiff establish his title to the land in controversy by adverse possession during the statutory period? After careful investigation of all the evidence we think this question must be answered in the affirmative. We have examined all the authorities cited by both appellant and respondent upon this point, as well as all the other authorities that were available, and must admit that there is a great lack of uniformity of views upon this subject. It is generally conceded, however, and this must be true from the very nature of things, that no specific rule can be laid down for the government of every case of this kind, but that each case must be governed by the circumstances surrounding it. It must be conceded at the outset that the hostile possession must be continuous and notorious, and that it cannot be made out by inference, as the presumption is in favor of the true owner. It must be exclusive; for where there are two in possession, one with and the other without title, the law will ascribe the possession to him who has the right. It must be continuous; for so soon as the adverse possession

ceases the constructive seizin incident to the better title is renewed. It must, of course, be under claim or color of title, or it would not ripen into title. But admitting all these propositions in favor of appellant, we think the respondent's claim is established.

It is well established and, in fact, not denied, that Eldridge entered into possession under the highest claim of title, viz., a warranty deed from the owners; and there is no question of subordination or subserviency to a higher title in the case. The contract was an executed contract. The ouster of the legal seizin was complete according to the undisputed testimony of Eldridge. It was not a mere trespass, for under color or claim of title Eldridge, after having received the deed, and on the same day took possession of the land; not a constructive possession, but a *pedis possessio*, an actual entry and possession, in fact. Eldridge's testimony on this point was as follows:

"When I received the deed from Thomas Jones I asked him to go with me and show me what there was. I went with him; we went in the house where he had lived while he was perfecting his title; showed me the amount of improvements and walked over the premises and gave me possession of the property and turned it over to me, and I believe my right to it has never before been questioned by anyone."

It is true that the improvements spoken of were supposed to be on the west half of the claim, the portion belonging to Thomas Jones, but outside of the question of constructive possession of the whole claim by the actual possession of any portion of it, the witness was testifying to the whole claim purchased, of three hundred and twenty acres; and afterwards, in cross-examination, he testified positively that Jones and he, on the day he took possession, went all over the claim. The day after the deed was executed it was filed for record in the proper recording office; and while this was, of course, only constructive notice it

49—4 WASH.

has a tendency to show the openness of the transaction on the part of the grantee.

There having been, then, an actual taking under a claim of title, was the possession notorious, exclusive and continuous? If there was any possession at all it was exclusive, for there is no pretense of any possession or claim of any kind by Betsy Jones or her heirs, or by anyone, excepting Eldridge and his grantees, for nearly thirty years. If it was a possession at all it was continuous, for the same authority was exercised by Eldridge and his grantees during all these years. That it was open and notorious cannot be doubted as, from the testimony, Eldridge was generally recognized in the neighborhood as the owner of the land. When anyone wanted to live on the land or wanted to cut timber or to do anything whatever with or concerning the land they came to Eldridge for permission. He, time and again, gave permission to various persons to cut shingle timber on the land, and sold and disposed of timber, to be used as props, to the coal company and to individuals. It is true that this land was not fenced or cultivated; it is true that Eldridge did not live on the land; but it is equally true that he continuously exercised authority over it. According to the testimony, the land in question was densely timbered at the time it was purchased, and for many years afterward it was chiefly valuable for its timber, and it was in regard to the disposition of the timber that Eldridge was most frequently called upon to exercise acts of authority and ownership.

It was said by the supreme court of the United States in *United States v. Arredondo*, 6 Pet. 691, that neither actual occupation, cultivation or residence are necessary to constitute actual possession. This doctrine was again announced by the supreme court of the United States in *Ellicott v. Pearl*, 10 Pet. 412. There the court said that an actual residence or an actual inclosure was an act pre-

sumptive of an intention to assert an ownership and possession over the property, but that there were many other acts equally evincive of such an intention.  In that case the court also decided that an entry into possession of a tract of land under a deed containing metes and bounds gave a constructive possession of the whole tract.  Again, the same court in *Ewing v. Burnet,* 11 Pet. 41, lays down the rule:

"It suffices for this purpose, that visible and notorious acts of ownership are exercised over the premises in controversy, for twenty-one years, after an entry under claim and color of title.  So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases.  But it may with safety be said, that where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued for twenty-one years, with the knowledge of an adverse claimant without interruption, or an adverse entry by him, for twenty-one years, such acts are evidence of ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been taken and held.  When the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim."

In that case the land in controversy was a lot, and its principal use and value was in the convenience of digging sand and gravel for the inhabitants.  Mr. Justice Baldwin, in delivering the opinion of the court, in reviewing the acts constituting adverse possession, thus recounts them:

"He paid taxes upon this lot from 1810 until 1834, inclusive, and from the date of the deed from Symmes until

the trial, claiming it as his own.   During this time he also claimed the exclusive right of digging and removing sand and gravel from the lot; giving permission to some, refusing it to others; he brought actions of trespass against those who had done it, and at different times made leases to different persons for the purpose of taking sand and gravel therefrom, besides taking it for his own use, as he pleased."

The court held that the circumstances testified to as related were sufficient to warrant the jury in finding in favor of adverse possession.   In speaking of some of these circumstances the court says:

"These circumstances would seem to have been alluded to to show the intention with which the acts previously referred to were done; in which view they were important, especially the uninterrupted payment of taxes on the lot for twenty-four successive years, which is powerful evidence of a claim of right to the whole lot."

We think the case at bar, while very similar in many respects, is a stronger case for respondent than the case of *Ewing v. Burnet.*   It is true in this case Eldridge had not brought any actions of trespass against anyone; but the facts seem to be, from the testimony, that his claim to the land was so commonly known and so universally respected and undisputed that no one ever ventured upon the land without first having obtained his consent.   He had paid the taxes regularly for twenty-eight years; had exercised just such acts of ownership over the land as any man would exercise over similar land upon which he did not live.   So far as the appellant, Dibble, is concerned, while it may not strictly affect the legal question involved, yet he was aware of Eldridge's reputed ownership of the land, having accepted a deed from him for a portion of the land prior to the purchase by him of the rights of the alleged heirs; so that his claim is merely a technical one which does not appeal very strongly to the equity side of the court.   We

think the testimony as a whole sufficiently shows acts of possession over the particular land in controversy to warrant the findings of the lower court on this point, and without further reviewing the many authorities cited, so decide. This renders an investigation of the second proposition discussed unnecessary.

The judgment is affirmed.

ANDERS, C. J., and STILES, J., concur.

HOYT and SCOTT, JJ., concur in the result.