[No. 29000. Department One. June 25, 1943.]

ANNA ROESCH, *Respondent*, v. CAROLINE R. GERST, *Appellant*.[1]

[1]Reported in 138 P. (2d) 846.

*Almon Ray Smith,* for appellant.

*H. E. Foster,* for respondent.

JEFFERS, J.—This action was brought by Anna Roesch against Eddie Roesch, Louis Roesch, Caroline R. Gerst, Charles Roesch, Percy White, and Rose White, to quiet title in plaintiff to certain property located in King county, Washington. The complaint alleged that plaintiff is the owner and seized in fee simple of such property, and is and has been for many years in possession of same; that defendants claim to have some right, title, or interest in or to the property, but that such claim is ill-founded.

By stipulation, all of the defendants except Caroline R. Gerst were dismissed from the action.

By her answer, defendant, Caroline R. Gerst, admitted that plaintiff has been in possession of the property, admitted that she (defendant) claims some interest in the property, and denied the other allegations of the complaint. Defendant alleged affirmatively that she is the owner in fee simple, and entitled to the possession of the property; that her title is deducible of record from the United States of America; and that defendant and her predecessors in title have paid all general taxes levied against the property. Defendant prayed that title be quieted in her.

Plaintiff, by her reply, denied the affirmative matter set up in the answer.

The cause came on for hearing before the court, and, on July 20, 1942, the court made and filed the following memorandum opinion:

"In my opinion the evidence establishes that for more than ten years prior to the bringing of this suit, the property in question has been in the actual, open, notorious, adverse, continuous and exclusive use and possession of the plaintiff, under claim of right, and

that she is entitled to have the prayer of her complaint granted, quieting title in her, free from any claims thereto by the defendant, together with her costs.

"A decree in conformity herewith may be presented for signature."

A decree in conformity with the memorandum opinion was signed on July 27, 1942, and filed the following day. On July 28, 1942, defendant filed a motion for new trial. Plaintiff moved to strike from the files defendant's motion for new trial, on the ground that the motion was not filed within the time provided by statute. On October 22, 1942, the court entered an order denying plaintiff's motion to strike, and denying defendant's motion for new trial.

On November 9, 1942, defendant served on counsel for plaintiff her notice of appeal from the judgment entered on July 28, 1942, and on November 10, 1942, filed such notice of appeal, together with an affidavit of service of same.

Appellant's assignments of error are that the court erred in deciding that respondent has been in adverse and exclusive use and possession of the property in question, under claim of right, for more than ten years; in rendering a decree and judgment that respondent is the owner and seized in fee simple of the real estate here involved; in not granting the prayer of the affirmative defense, restoring to appellant the possession of the property, and quieting her title thereto.

At the outset, we are met by a motion made by respondent to dismiss this appeal, for the reason that the notice of appeal was not given within thirty days after the entry of judgment. It is respondent's contention that, in this kind of a case, a motion for new trial must be filed with the clerk, and served upon the adverse party, within two days after receipt of a memorandum decision, and not within two days after entry of the formal judgment. This specific question was before this court in the case of *Bezich v. Columbia Ins. Co.*, 168 Wash. 379, 12 P. (2d) 413, and was de-

cided contrary to respondent's contention. The motion is denied.

While as indicated by the trial court's memorandum opinion, the judgment seems to have been based upon the theory of adverse possession, the testimony and respondent's argument indicate that she is basing her claim of right both on the theory of a parol gift and by adverse possession. We shall therefore discuss the evidence upon both theories.

Louis Roesch, at the time of this trial, was a man about seventy-eight years of age. Respondent, Anna Roesch, is the widow of Fred Roesch, who was a brother of Louis. Appellant, Caroline R. Gerst, is a sister of Louis Roesch. Julia Cimmerer, now deceased, was a sister, and Eddie Roesch is a brother, of Louis Roesch.

Louis Roesch and one Shafer acquired the property here in question in 1917, and had the title placed in the name of Charles Roesch, another brother of Louis. Charles Roesch never had or claimed any interest in the property. Sometime subsequent to its acquisition, Louis obtained Mr. Shafer's interest in the property. In 1922, at the request of Louis, Charles Roesch, by quitclaim deed, conveyed the property to Julia Cimmerer, who at all times held it in trust for Louis, making no claim to any interest therein. On September 11, 1934, at the request of Louis, Julia Cimmerer, by quitclaim deed, conveyed the property to Caroline Gerst, appellant herein, who held it as trustee for Louis until September, 1941, when Louis turned the property over to her, since which time Louis has claimed no right, title, or interest in it.

It does not appear just why Louis Roesch had the title to the property taken and held by his brother and sisters. There is nothing in the record to indicate that it was done for the purpose of defrauding anyone, or covering up the title, and it appears that respondent knew that Louis was the actual owner.

It was stipulated that at the time of trial the record title stood in the name of Mrs. Gerst.

Louis Roesch came to Seattle from Buffalo, New York, in about 1906. Sometime thereafter he became engaged with his brother Edward in the automobile business. In about 1918, when Louis was visiting his mother in the east, he saw his brother Fred and respondent, who at that time lived in Buffalo. Fred was sick, and had been for some time. Respondent testified on direct examination that in 1918 Louis came to their home in Buffalo and said that he was going to incorporate a company, and wanted Fred and her to come to Seattle, which they did in April, 1919. Respondent's direct examination continues:

"Q. When Louis was there in 1918, what if anything did he say about his business being prosperous or otherwise? A. He said he had made enough money that he was going to start a business and form a company, and he was giving each one of his brothers and sisters stock in the company. He was going to incorporate a company and each one of them was to get so much stock. He promised Fred $5000 stock, and when he came out he gave him $2500. Q. What if anything did he say requesting you and Fred to come out here? A. He told me I had worked long enough and Fred was sick and if I would come out, he thought I was entitled to a rest, and he would give Fred a car and he would buy me a home and he would see we were taken care of."

The witness testified that she came to Seattle in April, 1919, and that Phil Gerst, her brother-in-law, came with Fred and her.

"Q. You three came together? A. Yes, with the understanding that I was to keep house for Phil. I was to keep house until Carrie [Mrs. Gerst] straightened up her affairs in the east, and then she was coming out."

She stated that she and Fred lived with Phil Gerst until the next spring (1920), when they moved out to the farm here in question.

"Q. What was said by Louis Roesch or any of them with reference to your going out there? A. He said he had gotten a place for me and now that Carrie had

come, I could go out to the ranch and live there, and it was mine; and I went. . . . Q. Did you have any talk with Louis after that? A. In 1934 I asked him, 'What are you going to do about me?' I said, 'What security are you giving me?' I said, 'If anything happens to you, you know the family will fight me.' He said, 'What I promised you I will still do.' "

Mrs. Roesch testified that from 1920 she and her husband continued to live on this place until her husband's death, and that she has continued to live there since that time; that no one had ever disputed her rights there.

Neither respondent nor her husband owned a home in Buffalo, and in 1918, her husband was out of work, and respondent was supporting him by taking in sewing.

Louis Roesch admitted that he told respondent he would take care of them, but he denied that he ever promised her he would give her the land here in question, or any other. He testified to the effect that he said he would take care of his brother and her, in view of Fred's condition, and the record shows conclusively that he did that. Louis gave Fred employment when he first came west, and until his condition was such that apparently he could no longer work steadily, at which time Louis took his brother and respondent to this farm. Louis had completely furnished it, and, during the years that followed, he caused many improvements and repairs to be made to the property. While respondent claimed, as showing that the property was considered as hers; that she leased part of it, it appears beyond question that this was done with the consent of Louis, and that all the money received from the rental was taken in, either by respondent or her husband, during his lifetime, and turned over to Louis, or Edward, who was acting for Louis, and used to pay taxes, etc., except such as Louis permitted respondent to use. It further appears that Louis paid the premiums on the insurance policies covering the buildings.

In other words, in our opinion, the testimony shows that all Louis ever agreed to do was to provide for his brother and respondent, and this he certainly did. The testimony shows that through the years Louis gave Fred money, and on at least one occasion gave respondent money to go back east to visit her mother.

As we have said, this brother, respondent's husband, was sick; he had no income, and he owned no home in Buffalo. Respondent and her husband came to Seattle, since which time they have been furnished a home and very largely supported by Louis. There are letters in evidence, written as late as February and April, 1942, by a party who had leased part of the property, addressed to Edward Roesch, who was acting for Louis, showing that the tenant recognized that respondent was not the owner of the premises.

Louis testified that he never knew respondent claimed this as her property until the papers in the present action were served upon him.

As further indicating that Fred Roesch did not consider that this property belonged to him and his wife, on March 1, 1928, Julia Cimmerer, who at that time held title to the property in trust for Louis, with Louis' permission entered into a lease of the property with Fred Roesch, for a term of six years. This lease was introduced in evidence, and was signed by both Fred Roesch and Julia Cimmerer. Respondent testified she knew nothing of this. We call attention to the following testimony given by Mrs. Roesch on cross-examination:

"Q. Now, did you understand that you were to move on to the place at Kent when you came to Seattle? A. Not on to the place in Kent. Louis was to buy a home when he saw one that he thought was right. Q. He did not say where the home would be? A. He did not say where the home would be, no. . . . Q. As a matter of fact, Mrs. Roesch, you know that in your conversation with Louis, he said he would provide a place for you and Fred because Fred was ill? A. Yes. Q. That is what he said, wasn't it? A. Yes. Q. And

he did, didn't he? A. Yes, he bought a home and I am living in it. Q. Whom did you think owned it when you and Fred moved in? A. Louis Roesch. Q. And you moved in with his permission? A. Yes, absolutely. He told me he got it, and I moved in and lived there ever since. Q. Have you paid any rent? A. No. Q. Have you paid any taxes? A. I paid taxes once, and when I took the rent I paid the taxes. Q. Out of the rent? A. Yes, out of the rent. That is what I was told I was supposed to do. . . . Q. Mrs. Roesch, how many years during the time you have lived on this place has the garden been leased to someone else? A. All with the exception of four years. . . . Q. Now was it for a cash rental? Was the garden rented for cash at so much a year? A. Yes. Q. Who collected the money? A. When my husband was alive he collected it. Q. What did he do with it? A. It was understood it was to go for the taxes. Q. I am asking what he did with it? A. He took it in to the folks in town. . . . Q. Have you collected any rent since your husband passed away? A. I collected all of it. . . . Q. What have you done with the money? A. Some of it paid repair bills and what was left I took in town for taxes. I shingled the barn and took them the money that was left. There was $22 left, and I gave it to Eddie and Eddie gave it to Louis to pay taxes. Q. Who gave you permission to use the money for shingling the barn? A. Louis Roesch."

■■ We shall first discuss the gift theory. It is well settled that there must be a clear and unmistakable intention on the part of the donor to make a gift of his property, in order to constitute a valid, effective gift *inter vivos* or *causa mortis*. Thus it has been held that a delivery of property, unless made with such intent, does not amount to a gift either of personalty or of realty. The donor must intend to relinquish the right of dominion on the one hand, and to create it on the other, and the intention to make a gift must be a present intention; a mere intention to give it in the future will not suffice. 24 Am. Jur., p. 738, § 21.

In the early case of *Jackson v. Lamar*, 67 Wash. 385, 121 Pac. 857, we stated that, while it is true that courts

have relaxed the rigor of the old rules, they have never departed from holding that something more is required to constitute a gift, either *inter vivos* or *causa mortis*, than the expression of an intent or purpose to give. We also stated that he who asserts title by gift must prove it by evidence that is clear and convincing, strong and satisfactory.

*Meyers v. Albert*, 76 Wash. 218, 135 Pac. 1003, quotes with approval the rule announced in the *Jackson* case, *supra*.

In the case of *Sturgis v. McElroy*, 113 Wash. 192, 193 Pac. 719, which involved a claimed parol gift of real estate, we stated:

"It is to be borne in mind that a parol gift must be established by 'clear, unequivocal and definite testimony,' and the acts claimed to be done thereunder should be equally clear and definite. . . . A parol gift must be an absolute, present gift, not a promise nor the expectation of some future act. It must be testimony of a gift *in praesenti*."

In the cited case, the son, who was claiming the farm as a gift from his father, was in actual possession, and had been for many years. We reversed the lower court, holding the testimony did not establish a gift.

In *Vaut v. Vaut*, 118 Wash. 221, 203 Pac. 377, it was contended there was a parol gift of a life estate, or more particularly, the exclusive possession of certain real estate during the life of the plaintiff. We call particular attention to the cited case, for there, as in the instant case, the only testimony which tended to support the original gift was that of the plaintiff herself. In the cited case, we stated:

"The respondent [plaintiff] was the only witness whose testimony tended to establish the original gift or contract. It is true, her daughter also testified, but her testimony is so very general in character as to be wholly without value in this regard. So that we have here the testimony of the aged mother to the effect that her son gave her the use of the property during her

natural life, and the testimony of the son denying such contract.

"There is nothing in the record to show that more credence should be given to the testimony of the mother than to that of the son. If equal credence be given to each, the one would outbalance the other, and without the assistance of surrounding facts and equitable circumstances, the respondent would not have even overcome the presumption of proof devolving upon her in the usual and ordinary case. Much less has she proved her case in the clear and convincing manner required by law. The rule of proof is one not of words but of substance and must always be kept in mind."

■ We are of the opinion that respondent in the instant case failed to establish a parol gift of this property at the time she was put in possession thereof; nor do the facts and circumstances shown to have occurred during her occupancy tend to demonstrate that Louis had given her the property. On the contrary, we are of the opinion that the facts all tend to show that, during all of the time respondent and her husband, and thereafter respondent, occupied these premises, Louis Roesch exercised dominion over the property, and that such dominion was recognized both by respondent's husband and by respondent herself.

When all the facts and circumstances of this case are considered, having in mind the kindness and consideration shown by Louis Roesch at all times for his brother Fred and respondent, we are compelled to the conclusion that, if Louis Roesch had ever told respondent he would give her the property, he would have done so, and would have had title transferred to her. This, Louis never did, even after 1934, when respondent, as she testified, asked him what he was going to do to protect her.

Respondent has failed to prove, by evidence that is clear and convincing, a parol gift of the property which is the subject matter of this case.

■ We now come to the question of whether or not respondent established her right to the property by adverse possession. This is the theory principally argued by respondent, and adopted by the trial court. The general rule is that a parol gift of land is invalid, and is ineffectual to pass title to the donee; and this is true even where the claimed gift is accompanied by possession, unless such possession is adverse or against the donor, and continues without interruption for the statutory period, or unless after taking possession the donee makes permanent and valuable improvements. 28 C. J., p. 655, § 56. The evidence in this case does not show that respondent made valuable or permanent improvements.

■ In the case of *Bellingham Bay Land Co. v. Dibble,* 4 Wash. 764, 31 Pac. 30, after discussing the elements which must be present to bar the title of the legal owner, we stated:

"It must be conceded at the outset that the hostile possession must be continuous and notorious, and that it cannot be made out of inference, as the *presumption is in favor of the true owner."* (Italics ours.)

In *Port Townsend v. Lewis,* 34 Wash. 413, 75 Pac. 982, we stated:

"Possession is not adverse, 'if it be held under or subservient to a higher title.' *Bellingham Bay Land Co. v. Dibble,* 4 Wash. 764, 31 Pac. 30."

In *Peoples Sav. Bank v. Bufford,* 90 Wash. 204, 155 Pac. 1068, we stated:

"The presumption that one entering upon the property of another does so in subordination to the title of the real owner is a valuable right of property. The disseisor is put to the burden of proof (*Skansi v. Novak,* 84 Wash. 39, 146 Pac. 160) and the title is not to be overcome by evidence of entry and occupation alone, but the hostile intent must be clearly demonstrated."

The same statement relative to presumption is found in the case of *Cameron v. Bustard,* 119 Wash. 266, 205 Pac. 385.

At the time respondent went into possession of the land here in question, she did so with the permission of Louis Roesch, knowing at the time that, while the record title stood in the name of Charles Roesch, Louis was in fact the owner of the property. Under this situation, the presumption would be that her possession was not adverse.

█ Possession, to be adverse, must be actual and uninterrupted, open and notorious, hostile and exclusive, and under a claim of right made in good faith. To constitute title, it must have continued for the entire statutory period. *Skansi v. Novak,* 84 Wash. 39, 146 Pac. 160.

It is true, as contended by respondent, that color of title is not an essential to adverse possession under the ten-year statute, but a claim of right made in good faith is always essential, where there is no color of title. *Skansi v. Novak, supra; Williamson v. Horton,* 157 Wash. 621, 289 Pac. 1025.

█ It is also true, as contended by respondent, that the word "hostile," as herein used, does not necessarily import enmity or ill will, but it does import that the claimant is in possession as owner, in contradiction to holding in recognition of, or subordination to, the true owner. *King v. Bassindale,* 127 Wash. 189, 220 Pac. 777; *Pacific Power & Light Co. v. Bailey,* 160 Wash. 663, 295 Pac. 943.

We are of the opinion the case of *Santmeyer v. Clemmancs,* 147 Wash. 354, 266 Pac. 148, is particularly applicable herein. In the cited case, we again stated that possession, to be adverse, must be actual and uninterrupted, open and notorious, hostile and exclusive, and under a claim of right made in good faith.

█ In the instant case, like the cited case, it may be admitted that the possession of respondent was actual and uninterrupted, open and notorious, for the statutory period, but we are of the opinion respondent's possession was neither hostile nor exclusive, and when we

say hostile, we have in mind our decisions above referred to. In the instant case, respondent and her husband went into possession with the permission of Louis Roesch. The facts show conclusively that both respondent and her husband recognized at all times the superior title of Louis Roesch.

It may be admitted that the claim of right now asserted by respondent might have been sufficient to ripen into a title by adverse possession if the facts had established that, during the statutory period, there had been an assertion of this right hostile to the superior right of Louis Roesch, but, in our opinion, the testimony utterly fails to show that respondent at any time, until this suit was instituted, claimed a right to the property, hostile to the right of Louis Roesch or appellant, who succeeded to the interest of Louis in September, 1941.

The record is replete with incidents showing that at all times both respondent and her deceased husband recognized that Louis Roesch was the owner of the property. This attitude on the part of respondent is entirely inconsistent with the contention she now makes, that she was holding the property adversely.

Respondent seems to make some contention that appellant's answer was defective, in that it did not allege appellant had been in possession of the property during the ten-year period. In making this contention, respondent apparently relies on Rem. Rev. Stat., § 156 [P. C. § 8161]. We had occasion to refer to § 156 in the case of *Santmeyer v. Clemmancs, supra,* wherein we stated:

"In *Wilkeson v. Miller*, 63 Wash. 680, 116 Pac. 268, quoting with approval to the same effect from *Balch v. Smith*, 4 Wash. 497, 30 Pac. 648, it was held that a complaint to recover possession of real property setting forth the nature of the plaintiffs' title was sufficient, without alleging that the plaintiffs were seized and possessed of the premises within the statutory period for commencing the action. The plaintiff had a right to maintain the action, even though Mr. Santmeyer was

not in the actual possession of the property at any time during the ten years next preceding the commencement thereof."

We are of the opinion the answer was sufficient to permit the introduction of evidence to show that appellant was the owner and entitled to the possession of the premises here in question.

For the reasons herein assigned, the judgment of the trial court is reversed, with instructions to enter judgment quieting title in appellant to this property, and awarding her possession thereof.

SIMPSON, C. J., MILLARD, STEINERT, and MALLERY, JJ., concur.

August 12, 1943. Petition for rehearing denied.