[No. 64-40665-3.     Division Three.     April 30, 1970.]

ORAN O. TURNER et al., Appellants, v. DELBERT A. ROWLAND et al., Respondents.

*Charles T. Sharp,* for appellants.

*Irwin, Friel & Myklebust* and *Wallis W. Friel,* for respondents.

EVANS, C. J.—Plaintiffs Turner and Hsieh brought this action against defendants Rowland and the other named defendants, seeking to quiet title to a parcel of land along the Palouse Highway at the north city limits of Pullman, Washington. The disputed parcel consists entirely of vacated or abandoned streets in College Hill Addition to Pullman. Plaintiffs claim title to the disputed parcel as successors by deed from the heirs of W. I. Parr, who plaintiffs contend acquired title by adverse possession.

By counterclaim the defendants Rowland also sought to quiet title to the disputed parcel, based upon the claim of record ownership.

All original defendants other than defendants Rowland were eliminated by order of default or stipulation, and the present controversy concerns only the respective claims of the plaintiffs Turner and Hsieh, and the defendants Rowland.

The trial court found that the plaintiffs had failed to establish their claim based upon adverse possession, and quieted title in the defendants Rowland. Plaintiffs appeal.

Plaintiffs assign error to the italicized portions of the findings of fact set forth below relating to their claim of ownership by adverse possession. Their basic assignment of error, however, is to the failure of the court to draw as a necessary conclusion from the total findings relating to plaintiffs' claim that the successors in interest to W. I. Parr are the owners by adverse possession of the disputed property.

.9.

Irving Parr, also known as W. I. Parr, and Anne Marie Parr, his wife, purchased the Parr property in 1936; plaintiffs Oran .O. Turner .and Mary K. Turner and Jack

Hsieh and Dorothy Hsieh purchased the Parr property from the heirs of said W. I. Parr and Anne Marie Parr by escrow contract dated March 4, 1966.

10.

In 1936, at the time of the purchase by Parrs, the disputed parcel consisted of brush and weeds, and was not improved in any way although there was situate thereon a small shack constructed without a foundation at some time prior to 1936, by persons unknown; a creek known as Missouri Flat Creek runs in a southerly direction on the westerly edge of the property; said condition remained unchanged except for the construction of a road through the property and the other activity hereinafter mentioned until the plaintiffs purchase thereof in March of 1966.

11.

Between 1936 and the date of the death of W. I. Parr on April 5, 1962, Mr. Parr and his sons constructed a sawmill, dwellings, and other buildings on the Parr property; during said period Parrs' knew the location of and respected their southerly property line, being the center line of Letterman Avenue extended easterly; *at no time did W. I. Parr claim to own the disputed parcel or claim any interest of ownership therein*; during said period W. I. Parr attempted to purchase the disputed parcel during the time it was owned by Everett L. Bowles as Guardian for Evelyn E. Bowles, but no purchase was effected because the asking price of the property was too high.

12.

During said period, the various activities of W. I. Parr in developing his own property involved the disputed parcel in the following ways:

A. He constructed a road in 1936 running northerly from Stadium Way (also known in the chain of title as Campus Loop Road and known in the community as Harvey Road) running along the easterly edge of the disputed parcel in a northerly direction to the Parr property; this road was used by the Parr's for ingress and egress to the Parr property and for the same reason by business invitees of the Parrs, such use continuing until said road was covered over with boulders and rendered impassible by the plaintiff Oran O. Turner after the property was purchased by him, in the summer of 1967 after commencement of this suit.

B. To protect the Parr property from flooding by Missouri Flat Creek, W. I. Parr placed timbers in the Creek and made small dams by placing grain doors against the timbers; one of such dams was below the northerly border of the disputed parcel and the other dams were above such border; each year high water and river ice would wash out the dams and they would be rebuilt the following summer.

C. W. I. Parr ran an irrigation pipe from various areas of the Creek, including the area of the dam below the northerly boundary of the disputed parcel to the Parr tract to irrigate his garden.

D. From time to time W. I. Parr brought in a bulldozer to dredge the Creek, the times between said dredging being from four to six years; on each such occasion the Creek would be dredged above the northerly line of the disputed parcel, and at times, although not each of such times, he had the bulldozer dredge below said line in the creek.

E. At times W. I. Parr hauled silt from the creek bed, including places where it passed through the disputed parcel, to the Parr property, to raise the ground and protect from flooding, and except for the placing of gravel and cinders on the roadway, no filling was done on the disputed parcel.

F. W. I. Parr constructed a pipeline from the right of way of Stadium Way which ran underground beneath a ditch on the westerly side of the access road across the disputed parcel, and an irrigation ditch running east to west along the south boundary of the disputed parcel thence northerly parallel to Missouri Flat Creek to the dam mentioned in paragraph B above.

G. W. I. Parr kept beehives, some of which, at various times, were placed below the northerly line of the disputed parcel to take advantage of the clover on the disputed parcel; said hives were removed each season after the pollination season had ended; the frames on which the hives were placed were not so removed.

*Said acts of W. I. Parr and the other members of his family were not adverse or hostile, nor were they done under a claim of right; said acts, except for the use of the road, pipe and ditch (A and F above) were not continuous; and the maintenance of the pipeline, except during the brief period of its installation, was not open or notorious.*

### 13.

Some people named Porter were tenants in a house owned by one Oscar Johnson which was placed by him, with the permission of Mr. Parr, on the Parr property for a period of approximately three years; the Porter family planted and tended a garden on the disputed parcel for a year or two; no showing was made in this case that W. I. Parr ever granted permission to the Porters to maintain said garden or that he ever purported to have the authority to give such permission.

### 14.

One Larry Lacy was a tenant in a trailer on the Parr property from April of 1957 until October of 1961. During 1958 and 1959 Larry Lacy built a hog pen out of scrap lumber and a hog shed on the disputed parcel which was thereafter torn down; Larry Lacy knew where the property line was and that he was building said structures below the border of the Parr property; Larry Lacy discussed with W. I. Parr the advisability of raising hogs, but never received permission from Mr. Parr to build said structures nor did Mr. Parr purport to have the authority to grant such permission.

### 15.

At various times during the Parr ownership of the Parr property particularly during the earlier years thereof, hobos camped on the disputed parcel and occupied the small shack thereon; W. I. Parr and wife took no action to evict said persons from the property and in fact members of the Parr family refused to allow their children to play on the disputed parcel when hobos were in the area.

### 16.

*All of the acts of W. I. Parr which involved the disputed property were done for the improvement of his own property, not for the improvement of or use of the disputed property by himself or members of his family.*

### 17.

No person was readily available during the years in question to grant permission for various uses of the disputed parcel by W. I. Parr and family; *all of the acts heretofore mentioned by W. I. Parr involving the disputed parcel were of such nature that permission therefor would have been presumed by him.*

█ This court's function on review is set forth in *Krona v. Brett,* 72 Wn.2d ·535, 542, 433 P.2d 858 (1967), wherein the court, citing *Mugaas v. Smith,* 33 Wn.2d 429, 206 P.2d 332, 9 A.L.R. 846 (1949), states:

> The character of the respondent's possession over the statutory period is one of fact, and the trial court's finding in that regard is to be given great weight and will not be overturned unless this court is convinced that the evidence preponderates against that finding.

The trial court in its oral opinion, made the following comment:

> It is obvious here Mr. Parr himself never made any claim that he owned this property. He continually told people he didn't own it. He told his renters he didn't own it. They could go ahead and use it if they wanted to, he didn't care, why would he care? It wasn't his. Nobody else objected, so there was no reason why he should. As to his user of it, there has to be some claim of title, some claim of right. I own this property. This is mine. In absence of that, you can't acquire title by adverse possession, and this isn't present in this case, . . .

█ As stated by the court in *Roesch v. Gerst,* 18 Wn.2d 294, 138 P.2d 846 (1943), regarding adverse possession:

> [T]he word "hostile," as herein used, does not necessarily import enmity or ill will, but it does import that the claimant is in possession as owner, in contradiction to holding in recognition of, or subordination to, the true owner. *King v. Bassindale,* 127 Wash. 189, 220 Pac. 777; *Pacific Power & Light Co. v. Bailey,* 160 Wash. 663, 295 Pac. 943.

See also *Fisher v. Hagstrom,* 35 Wn.2d 632, 214 P.2d 654 (1950); *Young v. Newbro,* 32 Wn.2d 141, 200 P.2d 975 (1948); *Beck v. Loveland,* 37 Wn.2d 249, 222 P.2d 1066 (1950); *El Cerrito, Inc. v. Ryndak,* 60 Wn.2d 847, 376 P.2d 528 (1962); *Frolund v. Frankland,* 71 Wn.2d 812, 431 P.2d 188 (1967); *Krona v. Brett, supra.*

The testimony that W. I. Parr did not possess the requisite hostile intent came from two of his daughters and a former tenant. They testified that Parr always recognized the boundary line between his property and the disputed

parcel. On cross-examination Mrs. Murray Mae Howard, one of Parr's daughters, testified as follows:

Q. To your knowledge, did your father ever make any claim that he owned the property south of Letterman Avenue? A. No, he didn't. He spoke to Clarence Nye some about it, that he would like to get it, but— . . . Yes, he [Parr] spoke to us because we were there quite a bit and he said he would like to develop it because it was an eye-sore the way it was. It had brush and weeds and things on it, and he [Parr] tried to clean it up from time to time and he just as far as we knew the contact that he made he could never get it, but he wanted it. Q. Do you know if he ever even found out, was ever able to find out the owner of it? A. Oh, yes. Q. And who do you understand was that owner? A. Mrs. Bowles, and it was tied up in an estate to where he couldn't touch it, and I don't know that he contacted some of the family, but the thing he told us was they had it so far out of his reach that he couldn't get it.

Mrs. Howard later testified her father did not buy the property because the asking price was too high. Larry Lacy, one of the tenants on Parr's property from 1957 to 1961 used part of the disputed parcel for a hog pen and a hog shed. When asked whether he used property on the disputed parcel with Mr. Parr's permission, Lacy testified that:

I discussed this with him and I think that it would be correct to say that I was under the assumption his property quit somewhere in this neighborhood, but we decided to go ahead and raise hogs there anyway.

Lacy also testified that Parr never gave him permission to use the disputed parcel for his own use.

The evidence is uncontroverted that Parr at all times recognized title in someone other than himself. The evidence is also clear that Parr never treated the property as if he were the true owner. As stated in *Roesch v. Gerst, supra,* the claimant must be in possession as owner and not in a manner subordinate to the title of the true owner.

The trial court further found that:

All of the acts of W. I. Parr which involved the disputed

property were done for the improvement of his own property, not for the improvement of or use of the disputed property by himself or members of his family.

There is substantial evidence to support those portions of the findings of fact of the trial court to which error is assigned. They will not be overturned on appeal. *Krona v. Brett, supra, Mugaas v. Smith,* 33 Wn.2d 429, 206 P.2d 332, 9 A.L.R. 846 (1949). Furthermore, findings of fact No. 9-17, inclusive, support the conclusion of the trial court that the plaintiffs failed to establish their claim based upon adverse possession.

▆ Having failed to sustain their claim of ownership by adverse possession, plaintiffs attack defendant's claim of ownership. They have no standing to do so. The plaintiff in an action to quiet title must succeed on the strength of his own title and not on the weakness of his adversary. *Rohrbach v. Sanstrom,* 172 Wash. 405, 20 P.2d 28 (1933). In *Shelton Logging Co. v. Gosser,* 26 Wash. 126, 66 P. 151 (1901), the plaintiff-appellant held through conveyance from the state, and the respondent-defendant claimed the property under a patent from the United States, the validity of which the appellant questioned. The court held that appellant's legal title was invalid and stated, in answer to appellant's attack on respondent's legal title, at page 132:

Appellant's title having failed, it is unnecessary to inquire whether or not the respondents had title to any portion, and, if so, what, . . .

Plaintiffs' claim of ownership by reason of adverse possession having failed, they become strangers to the property and to defendants' counterclaim to quiet title.

The judgment is affirmed.

GREEN and MUNSON, JJ., concur.

---

Petition for rehearing denied June 26, 1970.