[No. 9560. Department Two. June 13. 1911.]

JOHN JOHNSON, *Respondent*, v. L. P. INGRAM *et al.*, *Appellants*.[1]

LIMITATION OF ACTIONS — REAL PROPERTY — ADVERSE POSSESSION. One claiming land by adverse possession, inclosed and held by him under a mistake as to the true boundary line of lots purchased by him, cannot invoke the seven-year statute of limitations for the recovery of land held under color of title; since the paper title is in the true owner, and the ten-year statute applies.

ADVERSE POSSESSION—MISTAKE AS TO BOUNDARY—ESSENTIALS—INTENT. Whether the inclosing of land of another under a mistake as to the true boundary line constitutes adverse possession is a question of fact, depending upon intent and disseizin of the owner at the time.

SAME—EVIDENCE—SUFFICIENCY. The evidence sufficiently shows an adverse holding constituting title after the lapse of ten years, where the purchaser of lots took possession and fenced the land according to the lines established on the ground, and built a house thereon and occupied or rented it and paid taxes for fourteen years, believing that he had purchased the identical land, and without any notice of a mistake in the survey in locating the lines, which was not discovered until after the period of limitation had run.

SAME—ESTOPPEL TO ASSERT ADVERSE POSSESSION—EVIDENCE—SUFFICIENCY. After a title ripens by adverse possession, evidence to sustain an estoppel must be clear and convincing; and it is not enough

[1]Reported in 115 Pac. 1073.

that one in adverse possession for fourteen years moved his house
across the line of a new survey, as he claimed to get it on higher
ground, where he still claimed the title in good faith, attempted to
pay taxes upon the whole tract, and instituted a suit to quiet title
and to restrain the erection of a building shortly after construction
was commenced.

IMPROVEMENTS—ACTION TO RECOVER LAND—COUNTERCLAIM FOR BET-
TERMENTS—STATUTES—RELIEF. Under the betterment act, Rem. &
Bal. Code, § 797, providing that, in an action for the recovery of
real property from one holding in good faith under color or claim
of title, the value of permanent improvements and the amount of
taxes paid must be allowed as a counterclaim to the defendant, one
having in good faith acquired record title and entered into peaceable
possession and commenced the erection of a building is entitled to a
counterclaim for the taxes paid and the value of the building by
him erected pending a suit to quiet title brought by one who had
acquired actual title by adverse possession under a mistake as to
the true boundary; and no damages having been shown, the decree
should secure payment of the same, or, in default thereof, make the
parties tenants in common according to their proportionate in-
terests.

Appeal from a judgment of the superior court for King
county, Gilliam, J., entered February 8, 1911, upon findings
in favor of the plaintiff, after a trial on the merits before
the court without a jury, in an action to quiet title.  Modi-
fied.

*Carkeek & McDonald*, for appellants.

*Longfellow & Fitzpatrick* and *W. R. Bell*, for respondent.

CHADWICK, J.—In the year 1890, respondent purchased
lots 11 and 12 in the J. J. Moss first addition to Seattle, and
went into possession.  A house had been erected by his
grantor.  He cleared and fenced the lots and built a bulk-
head along one side thereof.  He erected necessary outbuild-
ings so as to make it a comfortable and convenient home,
and it has since been occupied by his tenants.  South of the
Moss donation land claim was a tract of land belonging to
the Ladd estate.  This was surveyed and platted in 1904,
when it was discovered that lot 5, in block 25 of Ladd's sec-
ond addition to Seattle, covered all of lot 11 and a part of

lot 12 in block 31 of Moss' addition, being the property owned by respondent. Lot 5 in block 25, Ladd's addition, extends seven feet south of lot 11 in Moss' addition, so that seven feet of the land now occupied by a building which appellants have erected on the disputed property is not in controversy.

At the time the Ladd tract was platted, a line was run through, and the lots and blocks were staked on the ground. Although respondent denies any knowledge of these stakes, he admits that he talked of the survey in 1904 with a Mr. McFarland, who had bought lot 5 in Ladd's addition. Up to the time the Ladd tract was platted, taxes were paid by respondent and by the Ladds on the same property; but upon the filing of the Ladd plat, the county treasurer segregated the property on the rolls, and thereafter refused to accept taxes for that part of respondent's property lying over the Ladd line. At this time respondent was informed by the county treasurer of the adjustment of the lines, and of his reasons for refusing to accept the taxes. He then went to the resident agent of the Ladd estate, and sought to obtain a deed to the property. He found, as noted above, that it had been previously conveyed to another. Respondent, at or about this time, moved his house forty feet north, or just over the line between the Moss donation claim and the Ladd property. He has not since that time paid taxes or local assessments. These have been paid by the grantee of the Ladds, appellant's grantor. It is only fair to state that respondent says he moved his house because the sills were rotting, and he wanted to get it on higher ground, and that the party employed to do the work moved it further than he intended that it should be moved. Respondent lived at the town of Kent some miles away, and the work was done under the direction of an agent.

After the house had been moved and after respondent had notice of McFarland's claim to the property, he made McFarland his agent, and he thereafter collected the rents and

looked after the property for respondent.   McFarland tes-
tifies, however, that he told the tenants that he owned the
south 47 feet of the lot, all of which was inclosed by respond-
ent's fence.   In the year 1910, McFarland sold lot 5 of the
Ladd tract to appellants, who entered into possession.   They
tore down the fence and dug a basement and erected a foun-
dation covering the entire area of lot 5.   After they had
assembled their material, respondent brought this action to
quiet his title and restrain further interference with the
property, which he claimed as his own.   Upon preliminary
hearing, the court refused to grant a temporary restraining
order.   Pending the trial, appellants have erected and
equipped a modern apartment house at a cost of $8,000, all
of which, except the south seven feet, is on the disputed
ground.

It is the theory of respondent, and it was so held by the
trial judge, that respondent's title to the disputed property
had ripened under the statute of limitations.   It will be ad-
mitted that the paper title is in appellants, and therefore
the seven-year statute of limitations cannot apply.   So that
our inquiry is limited to a consideration of the ten-year
statute.   Whether the fencing of property of another, under
the mistaken notion that it is upon the true line, will start
the statute of limitations cannot be decided as a matter of law,
without resort to the facts of the particular case.   *Bowers v.
Ledgerwood*, 25 Wash. 14, 64 Pac. 936, was a case arising
out of mistaken boundary.   In that case the court said:

"As heretofore observed by this court, the question of ad-
verse possession is one of fact; and, though the fence may
have been established originally by mistake, if it were fol-
lowed by a claim to the land and such acts as clearly evinced
a determination of permanent proprietorship, the claim is
established.   The intention of the party claiming adverse
possession, and also the notice of such claim to the real
owner, must be inferred from the acts and declarations of the
parties."

And in the same case the following exception to the rule

was, upon the authority of *Caufield v. Clark,* 17 Ore. 473, 21 Pac. 443, 11 Am. St. 845, adopted by this court:

"If one by mistake inclose the land of another, and claim it as his own, his actual possession will work a disseizure, but if ignorant of the boundary line, he makes a mistake in laying his fence, making no claim, however, to the lands up to the fence, but only to the true line as it may be subsequently ascertained, and it turns out that he has inclosed the lands of the adjoining proprietor, his possession of the land is not adverse."

The rule of disseizin is thus defined in *McNaught-Collins Imp. Co. v. May,* 52 Wash. 632, 101 Pac. 237:

"In order to constitute adverse possession there must be a disseizin of the owner at some particular time. The possession must be open and notorious in order to give notice to the owner, so that he may have an opportunity to try title with the possessor, or usurper, as he may be termed. It must be continuous and exclusive, of course, and under color of title or claim of right, in good faith; otherwise the claimant would simply be a common trespasser."

In *McCormick v. Sorenson,* 58 Wash. 107, 107 Pac. 1055, 137 Am. St. 1047, which up to the time of the Ladd survey is on all fours with the case at bar, the court, still holding that a right could be initiated in a mistaken boundary, said:

"While it is true that Taylor originally made a mistake in fixing the lines, and by reason thereof unintentionally entered into the possession of lot 3 and part of lot 4, it is nevertheless apparent from the evidence that his possession thus obtained was immediately followed by a claim of right to the land; that he and his grantees erected a dwelling house and other buildings; that they planted fruit trees and otherwise improved the place; that each of the subsequent purchasers, before buying, went upon the property, saw the inclosure and improvements, intended to acquire the identical land so inclosed and improved, and that their mistake was not as to the particular land claimed or purchased, but as to its true description. These acts, which continued without interruption for a period of more than ten years, and until the

commencement of this action, certainly evinced an assertion of permanent proprietorship on the part of respondents and all of their grantors, back to and including Taylor, and constituted notice to the real owners."

Appellants seek to distinguish these cases from the one at bar by quoting the respondent's testimony tending to show that he did not intend to claim beyond the true line of the Moss donation land claim:

"Q. And you supposed at the time you built that fence that that was the correct line, did you not, of your lots?  A. Yes, sir.  Q. And you always supposed that was the correct line of your lots until the Ladds run their lines there?  A. Until we were stopped the taxes.  Q. And you always supposed that that fence divided you from the Ladd property?  A. Yes, sir."

We may well question whether the line of a donation claim or government subdivision is ever in the mind of the purchaser of town lots.  Certainly there is nothing in this case to indicate that any lines other than the lot lines were considered by the purchaser.  This is evidenced by the fact that he measured and fenced the lots as they had been laid out by Moss, and has claimed them as his own for more than ten years. In the case of *Schlossmacher v. Beacon Place Co.*, 52 Wash. 588, 100 Pac. 1013, the same question was before the court. There the one who had made entry testified as follows:

"Q. Where was your north line?  A. It was right on a line with Dearborn street.  Q. When you went there, your idea was to take possession, of course?  A. Certainly.  Q. Of just what your deed called for?  A. Just that.  Q. You had no intention of taking possession of any more property than you were entitled to under your deed?  A. No, sir."

The court, speaking through Judge Morris, said:

"Appellant urges that this testimony shows the possession of the Nelsons was not under a claim of right, and cites *Wilcox v. Smith*, 38 Wash. 585, 80 Pac. 803.  The rule announced in that case is: 'If a party only claims to a given line, and makes no claim as to where such line is located, his adverse possession is limited to such line wherever the same

may be established.' That case is not controlling here, for the reason that the testimony shows that the Nelsons *did make a claim* to their true north line as the .south line' of Dearborn street, and that for over fourteen years they openly and notoriously claimed this line by the maintenance of the bulkhead as their true north line. The rule applicable to the facts in this case is as held in *Bowers v. Ledgerwood*, 25 Wash. 14, 64 Pac. 936, adopting the doctrine of *Caufield v. Clark*, 17 Ore. 473, 21 Pac. 443, 11 Am. St. 845: 'If one by mistake inclose the land of another, and claim it as his own, his actual possession will work a disseizure.' The Nelsons may have been mistaken in regarding the south line of Dearborn street as their true north line, but they did so regard it; not under any theory of an intention to hold only to the true line, as it might .be subsequently ascertained, as in *Wilcox v. Smith, supra*, but under the belief that their deed called for such line as the true boundary line, and a manifest intention on their part to so regard it and hold it as against all the world."

It is admitted that, if respondent's title had ripened, his subsequent acts would not defeat it, but are competent to be considered as indicating the intention of respondent at the time of his entry. Under the authorities cited, there can be no doubt that the respondent's title had ripened at the time the Ladd survey was made, and that his subsequent conduct with reference to that survey could not be held to color his original entry. We hold, therefore, that all that was done, considering the lapse of time, was not inconsistent with an original claim of right adverse to appellants grantors. So that, under the authorities cited, it is apparent from the whole record that respondent bought the land in good faith and occupied it for a time sufficient to ripen a title under the statute of limitations.

It is also apparent from the whole record that appellants bought the land in good faith. It is true that they knew of respondent's claim. That had been brought to their notice, but they say that they understood that respondent was satisfied with the line as it had been run on the Ladd survey. They were furnished an abstract showing a paper title.

They went into possession and at once began the erection of a valuable building. They were within the lines of their paper title, and while thus engaged had conversation with respondent in which he made no claim to the property, although he shortly thereafter began this action. A court of competent jurisdiction had refused to grant an order restraining the erection of their building. It is true that respondent moved his house shortly after the Ladd line was run, and that the Ladd grantees paid all taxes and local assessments; but evidence to sustain an estoppel, where title to real property is involved, should be clear and convincing; and, while the conduct of respondent might well be construed for or against him and the conscience of the court be satisfied, we question whether there is sufficient in the record to warrant us in saying that we are satisfied that he should be estopped to claim the title which the lapse of time had earned for him. Both parties bought in good faith, and have taken the land within the calls of their deeds. Up to 1904 there was no cloud or question upon respondent's title so far as the record discloses, nor did the Ladd estate have actual notice or knowledge of the entry of respondent. Each party had color or claim of title, and each made expenditure of money upon the property and in good faith, and, if possible, both should be protected. In 1903 the legislature passed what is known as the betterment statute, § 1 of which reads as follows:

"In an action for the recovery of real property upon which permanent improvements have been made or general or special taxes or local assessments have been paid by a defendant, or those under whom he claims, holding in good faith under color or claim of title adversely to the claim of plaintiff, the value of such improvements and the amount of such taxes or assessments with interest thereon from date of payment must be allowed as a counterclaim to the defendant." Laws 1903, p. 262, § 1 (Rem. & Bal. Code, § 797).

But for this act we would be inclined to hold that respondent was estopped. But the act is general in its terms, and

seems to have been passed to meet the equities of just such cases as we have now before us, and to permit the courts, where hardship would follow even the application of equitable principles, to do even justice between the parties, giving each an opportunity to save that which in good faith he has asserted as his own.

Under a statute somewhat similar to, though not as sweeping as our own, it was held by the supreme court of Wisconsin that the value of the improvements might be recovered. It was said:

"It is the entry upon the possession under the color of title asserted in good faith which creates the possession which entitles the possessor to recover for his improvements; and it is unnecessary that the person making the entry should believe that his title was superior to every other title to the property at the time of making his entry, in order to make his possession adverse; nor does a subsequently acquired knowledge that there is a better title in some other person necessarily change the nature of his possession from an adverse possession to a possession subordinate to the true title. In order to change the nature of the possession, there must not only be a knowledge that there is a better title, but there must be an express or implied yielding to such superior title." *Barrett v. Stradl,* 73 Wis. 385, 399, 41 N. W. 439, 9 Am. St. 795.

To sustain this doctrine, many cases are cited. The same rule was declared in *Templeton v. Lowry,* 22 S. C. 389. A betterment statute was there invoked, and the court said:

"So, too, the question as to *what* a party is entitled to recover is not left in any doubt, for the statute expressly declares that he is entitled to recover the value of *all* improvements made upon the land by the party from whom it has been recovered. There is no limitation as to the time when such improvements may have been made, whether before or after notice, or even knowledge of title in another. Here again there may possibly be room for legislative action, but certainly none for the action of the court. In fact, it might prove a very difficult task to fix any definite limit. It certainly would not do to say that where one has in good faith

bought and paid for a tract of land, honestly believing that he had obtained a good title and has commenced the construction of improvements, say the building of a dwelling house, he should be compelled to suspend the work when half complete, or run the risk of losing the value of what he might subsequently add, simply because he has received notice that some one else claims the land."

Under a statute which, like ours, makes color of title and good faith essentials of a right to recover, the supreme court of Arkansas said:

"The only requirements of the act, are that the occupant should have had peaceable possession, at the time the improvements were made, under color of title and under the belief that he was the owner of the land." *Beard v. Dansby,* 48 Ark. 183, 2 S. W. 701.

See, also, *Finnegan v. Campbell,* 74 Iowa 158, 37 N. W. 127.

We therefore hold that respondent is entitled to recover the property in dispute, subject to the payment within sixty days after the remittitur goes down of the value of that part of the building and improvements made thereon by appellants on the disputed property, together with taxes and assessments paid by them or their grantor, with interest at six per cent per annum (*Gould v. White,* 62 Wash. 406, 113 Pac. 159), in which event title to the improvements shall be confirmed and vested in him. If such payment be not made within sixty days, then appellants may within thirty days pay to respondent the value of the land apart from the improvements, in which event title to the land and improvements shall be confirmed in them. If neither party makes payment, they shall be tenants in common, each holding an interest proportionate to the value of the property, to be determined in the manner specified in the statute. The lower court made no finding of damages, and we find none of which a court of equity would take notice. In the record it appears that appellants claim their house to have cost them $8,000. There is evidence tending to show that respondent was willing at one time to take $1,700 for his whole property.

If the parties can settle on these values, they may so stipulate. If not, the lower court will find the values before entering a decree in accordance with this opinion. Remanded for further proceedings. Neither party will recover costs on appeal.

ELLIS, MORRIS, CROW, and MOUNT, JJ., concur.