[No. 13279.   Department One.   March 9, 1916.]

PEOPLES SAVINGS BANK, *Appellant*, v. FRANK BUFFORD *et al.*,
*Respondents.*[1]

ADVERSE POSSESSION—HOSTILE ENTRY—MISTAKE—EVIDENCE—SUF-
FICIENCY.  An entry upon a city lot in an outlying unsettled district
by mistake, believing it to be another lot purchased, and partly clear-
ing and fencing it and planting a garden, are not such acts as to put
the true owner upon notice that the occupant was asserting a hostile
claim, and not a mere trespasser; since title by adverse possession
requires entry and occupation with hostile intent, which must be
clearly demonstrated.

SAME—HOSTILE ENTRY—MISTAKE—RUNNING OF STATUTE.  In such
a case, the statute would not begin to run in favor of the occupant by
mistake until he put the lot to the purposes for which it was intended
when platted by erecting a house thereon; his earlier use not being
inconsistent with a permissive use.

EQUITY—SEEKING AND DOING EQUITY—QUIETING TITLE—ADVERSE
OCCUPANCY.  Where both parties seek equitable relief in the quieting
of title to a lot occupied adversely by the defendants by mistake for
less than the statutory period, mistaking it for their own lot in the
same addition, and the plaintiff, having the title and having paid
taxes for ten years, had offered to exchange its lot, improved by de-
fendants, for defendants' unimproved lot, the court will, upon the
maxim that he who seeks equity must do equity, require defendants
to make the offered exchange, or in the alternative at plaintiff's
option, repay plaintiff all taxes and assessments it had paid upon its
lot, occupied by defendants, from the time of defendants' entry to
date.

Appeal from a judgment of the superior court for King
county, Brawley, J., entered May 18, 1915, upon findings in
favor of the defendants, in an action to quiet title, tried to
the court.  Reversed.

*Kerr & McCord*, for appellant.

*McCafferty & Robinson*, for respondents.

CHADWICK, J.—Since the 3d day of February, 1897, ap-
pellant has been the owner of lot five, in block ten, in Ar-
mour's addition to the city of Seattle.  On the 11th day of

[1]Reported in 155 Pac. 1068.

September, 1903, one Kellog, being the owner, conveyed to respondents lot five, in block seven, in Armour's addition. Kellog went upon the ground with respondents and undertook to point out the boundaries of lot five in block seven. As a matter of fact, he pointed out lot five in block ten. Very soon thereafter, respondents slashed off a part of the brush, put a fence around three sides of the lot, and sowed some turnips. They did some clearing from time to time thereafter, and also some grading. The record is not entirely clear as to the time when the grading was done. It is reasonably clear, however, that the lot was used to a greater or less extent as a garden from the time respondents took possession up to the summer of 1907, when respondents built a five-room house upon it at a cost of about $1,200. At the time respondents purchased from Kellog, Armour's addition was in an outlying district, ungraded, unimproved, and but sparsely settled.

Appellant paid the taxes on lot five in block ten from year to year, including all special assessments. Respondents paid the taxes and special assessments on lot five in block seven. The tax notice for 1913 showing a tax for improvements, an agent of the appellant went out to see the property, and found the lot owned by it improved and occupied by respondents. He notified respondents that they were in possession of a lot owned by appellant. This seems to have been the first time that respondents had any notice or knowledge of the fact that they were not on the lot which they had purchased.

Failing to agree upon terms of settlement, appellant brought this action, praying for the possession of lot five in block ten, and that the title thereto be quieted, and for equitable relief. Respondents set up the statute of limitations, praying that the complaint be dismissed, and by amendment upon the trial, that their title be quieted.

Another fact, not very material, but indicative of the good faith of the parties, is that, at the time respondents built

their house, they put a mortgage upon it describing the property as lot five in block seven. The relation of the parties may be quickly summed up by reference to the memorandum of the trial judge:

"The only difference being that one was in possession of the property improving it, while the other was simply carrying it upon its books paying the taxes and giving no further attention to the property."

Upon the authority of *McCormick v. Sorenson*, 58 Wash. 107, 107 Pac. 1055, 137 Am. St. 1047, a decree was entered in favor of the respondents.

But it is not every possession that will start the running of the statute. There is a presumption attending always that one who enters into the possession of the property of another enters with the permission of the true owner, and holds in subordination to his title. The statute begins to run from the date of possession only when it is sustained by a hostile intent to claim adversely, or, where possession is taken by mistake, the intruder exercises such dominion over the property as to put the true owner upon notice of the hostile claim. As is said in the books:

"The disseisor 'must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest.'" 1 R. C. L. 693.

In other words, a title by adverse possession, where land is claimed under mistake, "cannot be decided as a matter of law, without resort to the facts of the particular case." *Johnson v. Ingram*, 63 Wash. 554, 115 Pac. 1073. The claim must be followed by acts which clearly evince a determination of permanent ownership. *Bowers v. Ledgerwood*, 25 Wash. 14, 64 Pac. 936.

Where one enters upon land under a claim of right arising in or out of the chain of title, or under color of title, the entry is sufficient to start the running of the statute. But where one enters with the permission of the true owner—and

one who enters by mistake having no intention to claim that which is not within the calls of his deed is upon no higher plane—the statute will not begin to run until the record owner has actual notice, or the land is put to such uses as to put him upon notice that the occupant is not a mere trespasser, but is asserting a hostile claim.

The presumption that one entering upon the property of another does so in subordination to the title of the real owner is a valuable right of property. The disseisor is put to the burden of proof (*Skansi v. Novak*, 84 Wash. 39, 146 Pac. 160) and the title is not to be overcome by evidence of entry and occupation alone, but the hostile intent must be clearly demonstrated, that is to say:

" 'Regard must be had to the nature or quality of the acts, and to the situation of the property, as well as to the theory upon which the doctrine of adverse possession rests . . .'

"The circumstances of possession must be of such nature as to preclude a conclusion that the owner was misled by facts from which he might reasonably have supposed a mere trespass had been or was being committed, instead of the assertion of a claim of right. The acts of the invader are sufficient if they clearly show actual appropriation to his permanent and exclusive dominion and benefit; but they must visibly indicate intention of permanent occupation and appropriation. Actual residence on the land, however, is not necessary." *Sinclair v. Matter*, 125 Minn. 484, 147 N. W. 655.

"There is no fixed rule whereby the actual possession of real property by an adverse claimant may be determined in all cases." 1 R. C. L. 693.

Wherefore, as is said in *Bowers v. Ledgerwood, supra*, we must resort to the facts and circumstances of the instant case. The parties each had title to a specific town lot. There was no intention on the part of respondents to enter upon or claim appellant's property. They entered on the lot now occupied by mistake. Up to that time the rights of the parties were equal, for we cannot bring ourselves to hold that there is a greater duty upon the holder of an unim-

proved town lot to patrol his property than there is upon a
purchaser of a lot in an unimproved wooded district, to
ascertain, by resort to exact and proper measurements, the
true boundaries of his lot. It is always an important inquiry
in this class of cases to consider the character and intended
uses of the property. It would seem that the mere fencing
and sowing of some turnip seed were insufficient to initiate
a title to a town lot. It is not like land that may be pas-
tured or put to commercial crops or from which wood may
be cut. Such acts are not inconsistent with an intent to tres-
pass, for few owners would object to the use of his unim-
proved town lot by those who might plant a garden, erect a
chicken run, or pile wood upon it. Town lots are laid out
for the purpose of erecting dwellings and convenient out-
buildings, and the title to them should not be disturbed until
there is clear proof that the occupant intends to devote the
property to the uses for which it was intended.

Respondents did nothing that was not consistent with per-
missive use, or the act of a trespasser, until in 1907, when
they built the house they now occupy, and their right to
claim by adverse possession would not antedate that time.
This holding is not inconsistent with the holding of the court
in *McCormick v. Sorenson, supra*. It is not clearly stated
in the opinion, but reference to the statement of facts will
show that lots were bought by Sorenson's predecessor in
1892; that he entered upon the property of another by mis-
take in 1892, and either in 1892 or 1893, fenced the lots,
planted fruit trees, and erected a dwelling house. He raised
his flag. He put the lots to the uses intended by those who
had platted and put them on the market.

Both parties have asked for equitable relief. Each of them
have asked that their title be quieted in lot five in block ten.
At the beginning of the trial, appellant offered to make
a deed to respondents for lot five in block ten in considera-
tion of a deed to lot five in block seven. The first maxim in
equity is: *He who seeks equity must do equity.* Considering

that each party was acting in entire good faith, and each party has paid taxes upon their record titles during all these years; and that no claim was made to both lots by respondents until after the ten-year period after the first possession had run, we think it would be inequitable to permit appellant to oust respondents, or to permit respondents to refuse to either deed lot five in block seven or to reimburse appellant for the taxes it has paid upon the lot upon which they have erected their home. Equity will not give respondents more than they could have claimed at law if the mistake had been discovered in time to bring an action of ejectment.

Wherefore we have decided to compel respondents to do that which, in good conscience, they should have done in the beginning. As the mortgagee, if the mortgage is still unpaid, can assert a lien in equity upon lot five in block ten, our judgment is that appellant may elect whether it will take a deed to lot five in block seven to be executed by respondents, conveying all their right, title and interest in and to said lot free of all liens and incumbrances created or suffered by them, or, if appellant does not desire to take title to the said lot, the respondents shall reimburse appellant for all taxes and assessments paid out by it on lot five in block ten from the time of the entry of respondents until the present time.

Appellant will give notice of its election within thirty days after the remittitur goes down, and respondents will, within thirty days thereafter, execute the deed or pay the amount of the taxes as appellant may elect. If respondents refuse to convey, the court will appoint a commissioner to make the deed.

Remanded with instructions to execute this decree.

MORRIS, C. J., MOUNT, and ELLIS, JJ., concur.