[No. 31441. Department One. October 9, 1950.]

F. E. BECK, *Respondent,* v. CLYDE M. LOVELAND *et al.,*
*Appellants.*[1]

[1]Reported in 222 P. (2d) 1066.

*James A. Stinson,* for appellants.

*John Panesko,* for respondent.

BEALS, J.—For some time prior to 1934, R. Z. and Sylvia Chapman, husband and wife, were the owners of a tract of real estate in the northeast corner of the southwest quarter of the southeast quarter of section 1, township 12 north, range 4 east W. M., situated in Lewis county. Mr. Chapman and his sisters, Clara B. Barnum and Iola Thompson, owned the southeast quarter of the southeast quarter of the same section, less a railroad right of way, an existing county road, and certain other portions of the tract with which we are not here concerned.

By warranty deed dated July 18, 1934, Mr. and Mrs. Chapman, in consideration of $89.30, conveyed to Pete Powell a tract of land described as follows:

"Beginning at the Northeast corner of the S. W. ¼ of the S. E. ¼ of Sec. 1 Twp. 12 N. Range 4 East—; thence running West 400 ft. to Morton Randle Highway; thence along said highway in an Easterly direction to a point 195 ft. due South of point of beginning; thence 195 ft. North to place of beginning."

Pete Powell and Cecelia Powell, his wife, by warranty deed dated April 12, 1947, conveyed the land above described to Evelyn N. Van, who was then unmarried. Later, Evelyn N. Van and Clyde M. Loveland intermarried, and are the defendants in this action.

R. Z. Chapman and his sisters, by warranty deed dated January 27, 1937, conveyed to F. E. Beck (the plaintiff in this action) and Ivy Beck, his wife, the southeast quarter of the southeast quarter of section 1, township 12 north, range 4 east W. M., except the portions thereof referred to above.

April 18, 1949, F. E. Beck filed his complaint herein, alleging his ownership of the north half of the tract conveyed to him by Mr. Chapman and his sisters, as above set forth, and that the defendant Clyde M. Loveland had

destroyed a fence which the plaintiff had erected along the west boundary of plaintiff's property, to his damage in the sum of three hundred dollars, and had threatened to destroy any other fence which plaintiff should erect.

The defendants answered plaintiff's complaint, alleging ownership of the tract of land (above described) adjoining plaintiff's property on the west; that plaintiff had trespassed upon defendants' land by building a fence thereon, and that defendants had destroyed the fence. The defendants denied other material allegations of the complaint and, by way of a cross-complaint, alleged the conveyance of their tract by R. Z. and Sylvia Chapman to Pete Powell, by deed dated July 18, 1934; that Mr. Powell was placed in possession of this land by Mr. Chapman, who indicated to Mr. Powell the eastern boundary of the land so sold; that Messrs. Powell and Chapman built a fence along the line dividing their respective tracts of real estate; that Mr. Powell improved his property by constructing buildings thereon near and adjoining the fence, and that Messrs. Powell and Chapman used and cultivated their respective tracts up to the fence, during the period of their respective ownerships of the real estate.

The defendants also alleged the conveyance of the land by Mr. Chapman and his sisters to the plaintiff, by deed dated January 27, 1937, and that plaintiff and Mr. Powell had, at all times during their respective ownerships, recognized the fence built by Powell and Chapman as the boundary between their respective lands and had each maintained possession of his property up to the fence.

Defendants further alleged Powell's conveyance of the tract, by deed dated April 12, 1947, to Evelyn N. Van, who later married defendant Clyde M. Loveland, and that defendants and Mr. and Mrs. Powell, their predecessors in interest, had for more than ten years, namely from and after July 18, 1934, maintained open, notorious, exclusive, continuous, and adverse possession of the premises up to the line of the original fence. Defendants prayed that plaintiff's action be dismissed, and that their title to the land up to the line of the original fence be quieted in them.

Plaintiff replied to defendants' answer and cross-complaint, denying the allegations thereof and praying that the cross-complaint be dismissed, and that plaintiff have judgment as demanded in his complaint.

The action was tried to the court and resulted in the entry of a decree in favor of the plaintiff, quieting his title up to a boundary line on the west as shown by a survey and indicated upon a plat introduced in evidence in the action, both having been made by Oscar E. Olson, a civil engineer. The boundary line established by the decree is about thirty-five feet west of the line of the fence erected by Messrs. Chapman and Powell. The decree also permanently restrained defendants from interfering with any fence erected by plaintiff along the line indicated, and awarded plaintiff judgment for his costs, but allowed him no damages.

From this decree, defendants have appealed, making the following assignment of errors:

"The defendants assign as error that the trial court erred as follows:

"(1) In entering judgment in favor of plaintiff and against defendants that title of the plaintiff be quieted in and to the Southeast quarter of the Southeast quarter of Section 1, Township 12 North, Range 4, East of Willamette Meridian.

"(2) That the plaintiff's title to said property be quieted up to the West line, as shown by the survey made by Oscar E. Olson, a civil engineer.

"(3) In restraining defendants from interfering with, damaging or removing or attempting to remove any fence put up on said west boundary line."

Each appellant testified, calling as their only other witnesses Messrs. Powell and Chapman.

From the evidence, it appears that Chapman and Powell had agreed upon the sale of the land to Powell about a year prior to the date of the execution of the deed, and that Powell had been in possession of the land during that period. It also appears beyond question that the parties were unable to ascertain the true location of the north and south center line of the southeast quarter of section 1. At the time of the transaction between Powell and Chapman, neither one

desired to undertake the expense of a survey which would definitely locate the line in question, and each testified that they tentatively agreed upon the location of the point at which the description began (the northeast corner of the southwest quarter of the southeast quarter of section 1), until the true location of the point referred to should be established by an adequate survey.

At the time Powell purchased this tract from Chapman, there was no fence or other mark along the east line of the tract, and the parties erected a temporary fence to serve as a boundary until the true line should be definitely located. Apparently this fence remained in position until the spring of 1948, when respondent destroyed it.

Concerning the agreement between the parties, we quote portions of their testimony on direct or cross-examination. Mr. Powell testified:

"Q. How did you happen to build it [the fence] on the line on which you did build it? A. Well, I didn't know where the line was, nor did Chapman know, so we just decided to build it and whenever the survey was made why that survey would be the line. There was an agreement between Mr. Chapman and I. . . . It was agreed between Chapman and I when I bought it that whenever a correct survey was made that would be our line, so there was no question about it after we had already built the fence. . . . Q. And this fence that you made, this rail fence, neither you nor Mr. Chapman agreed that that was to be the boundary line? A. No. . . . Q. You never intended to claim then up to the fence did you? A. Certainly not. Q. As I gather, you only intended to claim to wherever the true boundary line actually was? A. Certainly. Q. Now when you built your buildings did you realize they might be over the line? [Objection overruled.] A. There was a possibility that it would be, yes. . . . Q. In other words, it was with your permission if he was using your land or it was with his permission if you were using his? A. Absolutely our agreement."

Regarding the same matter, Mr. Chapman testified.

"Q. Was this fence accepted, I will put it that way, by you and Pete Powell as the true dividing line between your property? A. No, it wasn't accepted as the true line. Q. Why not? A. Because we didn't know exactly where

the true line was. Q. What was accepted by you and Pete Powell as the true dividing line between your properties? A. We were to go by any true survey that was to be made. . . . Q. Did you put it there for the true line? A. No. . . . Q. That is the situation, that fence you and Pete Powell put there was a temporary fence then, was it? A. Yes. Q. And to be moved if a later survey was made changing the line? A. That is right. Q. That was the agreement? A. That was the agreement. Q. Was that the understanding? A. That was the understanding we had. . . . Q. That is what you agreed. Then it never was taken as the true line regardless of where the true line might be? A. It never was."

It is true, as argued by appellants' counsel, that Mr. Chapman, during his lengthy examination and cross-examination, at times became slightly confused, but he never varied from his testimony to the effect that he and his grantee, Powell, never intended that either one of them would claim any land beyond the north and south center line of the quarter section, and that the line of the north and south fence which the parties erected was only tentatively agreed upon as the boundary line between their properties and was always subject to correction if a survey demonstrated that the fence was not along the true line referred to in the deed.

The witness Powell positively testified that at no time did he make claim to any land east of the true line, when the same should be ascertained by survey.

Appellants purchased their land in 1947, and their claim here urged may be based only upon a prior claim by Powell, their grantor, that the fence erected in 1934 was the easterly boundary line of his property.

Appellants criticize the survey made by Mr. Olson, a registered professional engineer, but the record does not support their argument and they offered no evidence to impeach the survey as supported by Mr. Olson's testimony.

Appellants cite several of our decisions, arguing that this court has held that, under facts shown, the parties were bound by a line indicated by an existing fence. In this connection, appellants cite *Farrow v. Plancich*, 134 Wash. 690,

236 Pac. 288, quoting four lines which do not appear in the opinion.

The case cited and other similar cases are not in point because, under the testimony in the case at bar, the fence erected by Powell and Chapman in 1934 was never recognized as a line fence by either Powell or Chapman, and was never established as the boundary line between the tracts by a common grantor, but was tentatively agreed upon by the grantor Chapman and his grantee Powell, subject to correction in favor of either party by a survey, when made.

Appellants also argue that they have acquired title to the strip in question by prescription based upon adverse possession by appellants and their grantor Powell for the statutory period of ten years. We shall now consider authorities cited by appellants in connection with their contention, and other cases relevant to the question here presented.

Both appellants and respondents cite the case of *Bowers v. Ledgerwood,* 25 Wash. 14, 64 Pac. 936, in which this court stated certain basic principles in connection with the acquisition of title to real estate by adverse possession thereof for the statutory period of ten years. Rem. Rev. Stat., § 156 [P.P.C. § 73-3]. In the case cited, this court quoted from *McAuliff v. Parker,* 10 Wash. 141, 38 Pac. 744, the following:

" 'All the authorities hold that the question of adverse possession is a question of fact, and it must be a possession that is known to the owner of the legal title.' "

The court also quoted with approval from *Caufield v. Clark,* 17 Ore. 473, 21 Pac. 443, 11 Am. St. 845, as follows:

" 'If one by mistake inclose the land of another, and claim it as his own, his actual possession will work a disseizure, but if, ignorant of the boundary line, he makes a mistake in laying his fence, making no claim, however, to the lands up to the fence, but only to the true line as it may be subsequently ascertained, and it turns out that he has inclosed the lands of the adjoining proprietor, his possession of the land is not adverse.' "

In the case last referred to, the Oregon court held in favor of the party claiming the land by adverse possession, the

evidence disclosing the required degree of proof to support such a holding.

After quoting from these authorities, this court continued:

"As heretofore observed by this court, the question of adverse possession is one of fact; and, though the fence may have been established originally by mistake, if it were followed by a claim to the land and such acts as clearly evinced a determination of permanent proprietorship, the claim is established. The intention of the party claiming adverse possession, and also the notice of such claim to the real owner, must be inferred from the acts and declarations of the parties."

The court then held that the defendant in the action had obtained title by adverse possession, he having occupied the land for the statutory period "under a claim of right, and notorious and adverse to all other persons."

In *Roesch v. Gerst,* 18 Wn. (2d) 294, 138 P. (2d) 846, we said:

"Possession, to be adverse, must be actual and uninterrupted, open and notorious, hostile and exclusive, and under a claim of right made in good faith. To constitute title, it must have continued for the entire statutory period. *Skansi v. Novak,* 84 Wash. 39. 146 Pac. 160.

"It is true, as contended by respondent, that color of title is not an essential to adverse possession under the ten-year statute, but a claim of right made in good faith is always essential. where there is no color of title. *Skansi v. Novak. supra; Williamson v. Horton,* 157 Wash. 621, 289 Pac. 1025."

The court then observed that the word "hostile" does not necessarily import ill will, but it "does import that the claimant is in possession as owner, in contradiction to holding in recognition of, or subordination to, the true owner. [Citing cases.]" It was held that, while the possession of the adverse claimant was actual and uninterrupted, open and notorious, for the statutory period, it was neither hostile nor exclusive, the party in possession having recognized the title of the record owner. The case cited is in point here.

Appellants rely upon the case of *Alverson v. Hooper,* 108 Wash. 510, 185 Pac. 808, in which this court affirmed a judgment of the superior court in favor of the defendants, holding that they had acquired title to a tract of land bounded on one side by a fence. The evidence clearly showed that the fence was not along the true boundary line between the lands owned by the parties to the action. In the course of the opinion, the court said:

"While the evidence makes it clear that the fence is not on the true boundary line between the lands of the parties, and that it encloses land which a correct line would show is within the description of the appellants' instruments of conveyance, it does show that it was erected more than seventeen years prior to the commencement of the action, and that the respondents and their predecessors in interest have been in the sole and exclusive possession of the land so enclosed since that time, *claiming it adversely to the true owners.* While the fence was probably erected under a mistake of fact as to the true location of the line, we have repeatedly held, although perhaps it is not the uniform rule, that the fact of mistake does not prevent such possession and claim of ownership ripening into title by adverse possession." (Italics ours.)

The court then cited the case of *Wissinger v. Reed,* 69 Wash. 684, 125 Pac. 1030, in which this court, in upholding a claim of title by adverse possession, said:

"Respondents' adverse possession and claim of ownership of all the land up to their fence having continuously existed from April, 1896, up to the commencement of this action in March, 1910, a period of approximately 14 years, the fact that they were mistaken in the location of the true boundary line between the forty-acre tracts did not prevent such possession and claim of ownership from ripening into title by adverse possession."

In *Snell v. Stelling,* 83 Wash. 248, 145 Pac. 466, we said:

"It is true that possession originating in a mistake may become adverse. That, however, is a question of fact. There must be some evidence of a hostile intent and facts imposing notice of that intent to initiate an adverse holding. *Johnson v. Ingram, supra* [63 Wash. 554, 115 Pac. 1073]; *Bowers v.*

*Ledgerwood*, 25 Wash. 14, 64 Pac. 936. There is no such evidence in this case."·

In *Lindberg v. Davis,* 164 Wash. 680, 4 P. (2d) 501, this court affirmed a judgment of the superior court in favor of the record owners of a tract of land, who had brought suit to recover possession thereof and to quiet their title to the true boundary line between the properties owned by the respective parties. The defendants claimed title by adverse possession. The trial court found that the fence, up to which the defendants claimed ownership, had never been agreed upon or established as a boundary line fence between the properties, and that " 'neither the defendants nor their predecessors in interest have held adversely the land south of the said fence, claiming the same to be the true boundary line between Lots 3 and 4.' " This court approved the finding, the opinion stating:

"The finding is supported by a clear preponderance of the evidence. Between the respective owners of these lots from time to time, there was no hostile intent with respect to the use of the land, according to the evidence, until appellants purchased lot 4 shortly before this action was commenced.

"The rule applicable to the case is stated in *Snell v. Stelling,* 83 Wash. 248, 145 Pac. 466, quoting from Devlin on Deeds, as follows:

" 'Where neither party intends to claim beyond the true line, possession, up to what is erroneously supposed to be the true dividing line between adjoining proprietors, will not work a disseisin in favor of either of any land occupied by him under such erroneous belief.' 2 Devlin, Deeds (2d ed.), p. 1457, § 1037."

As above indicated, this court has repeatedly held that, before one in possession of real estate (without color of title) may successfully claim title thereto against the true owner by alleged adverse possession thereof for the statutory period, it must appear that such possession was maintained under a claim of right made in good faith. *Roesch v. Gerst, supra.*

Appellants argue that, as both parties to this action deraign their titles from Chapman (which is true as to re-

spondent, at least in part, as his title came through Chapman and his sisters), "this dividing line, fixed by the parties, is binding as to them and their respective successors in interest."

■■ There are authorities to the effect that a common grantor, under certain circumstances, may establish the boundary line between two tracts, both of which he owned. It is true that a purchaser of real estate may be bound by a line fence established by a common grantor, but such cases turn upon peculiar circumstances disclosed by the evidence. *Strom v. Arcorace*, 27 Wn. (2d) 478, 178 P. (2d) 959, and cases therein cited. These authorities are not here controlling.

In *Thomas v. Harlin*, 27 Wn. (2d) 512, 178 P. (2d) 965, 170 A. L. R. 1138, appears the following:

"In the absence of an agreement to the effect that a fence between the properties shall be taken as a true boundary line, mere acquiescence in its existence is not sufficient to establish a claim of title to a disputed strip of ground.

"In all cases, it is necessary that acquiescence must consist in recognition of the fence as a boundary line, and not mere acquiescence in the existence of a fence as a barrier. [Citing cases.]"

■ One of the elements essential to the establishment of a title to real estate by adverse possession, is the continuous possession of the property in question for the statutory period by one claiming title thereto, as owner, adversely to all other persons.

■ In order to prevail in the case at bar, it would be necessary for appellants, who acquired title to their property in 1947, to show that Powell, their predecessor in interest, had maintained possession, at least for a considerable period, of the strip in question while claiming to own it. This claim is clearly not supported by the testimony, including that of witnesses called by appellants.

The decree appealed from is affirmed.

SIMPSON, C. J., HILL, and DONWORTH, JJ., concur.

GRADY, J. (concurring in part and dissenting in part)—I am in accord with the view expressed in the majority opin-

ion that neither of the original parties to the survey agreement ever initiated a prescriptive title against the other. However, I am of the opinion that they abandoned the agreement by not carrying it out within a reasonable time after it was made. In any event, it being verbal, and the purchaser from Powell having no knowledge of its existence had the right to assume and rely upon the assumption that the fence marked the true boundary line. Chapman and Powell established the boundary line subject to a change if the survey they contemplated showed it to be incorrect according to legal subdivision lines. As time passed and no survey was made, Powell regarded the original line as the true one, and improved his property accordingly. Such agreements not acted upon prior to the advent of innocent purchasers should not prejudice them. If such be not the case, the purchasers of rural property in particular may not rely upon existing conditions and appearances, but must make inquiry to determine if, in the remote past, some common grantor had not made a verbal agreement with a grantee that the apparent boundary lines were dependent upon a possible survey at some indefinite time in the future. Title examiners and title insurance companies will find it necessary to except from their opinions or coverage the possibility of the existence of such agreements and thus the stability of titles will be seriously affected.

The judgment should be reversed.