[No. 32992. Department Two. December 16, 1954.]

PATRICK J. O'BRIEN, *Appellant,* v. DELMAR R. SCHULTZ *et al.,*
*Respondents and Cross-appellants.*[1]

[1]Reported in 278 P. (2d) 322.

McCallum & Zellmer, for appellant.

C. C. Rowan, for respondent.

Donworth, J.—Plaintiff and defendants are the owners of adjoining tracts of farm land in Lincoln county. This lawsuit stems from a dispute between them as to the location of boundary lines.

In the first cause of action in his amended complaint, plaintiff sought a decree adjudicating that he had acquired title by adverse user to a strip of land containing 3.746 acres and lying immediately south of the original true south boundary of his quarter section of land. He also prayed for one hundred sixty-five dollars in damages for trespass. In a second cause of action, plaintiff sought a decree establishing his title by adverse user to a strip of land lying in the west half of an abandoned roadway running along the eastern boundary of his lands, and asked for eighty-eight dollars in damages for trespass.

Defendants answered, denying the material allegations of the amended complaint, and also filed a cross-complaint seeking $506 as damages for destruction of fences and for trespass. They also prayed for a decree establishing the equidistant line as the true south boundary.

At the close of plaintiff's case, the trial court granted defendants' motion to dismiss both of plaintiff's causes of action on the ground that he had failed to prove either cause of action. Findings of fact and conclusions of law were made, and a decree was entered dismissing plaintiff's action and establishing defendants' title to the disputed strip containing 3.746 acres.

Plaintiff appeals, making seventeen assignments of error directed to all of the findings of fact, the conclusions of law, the entry of the decree, and the denial of his motion for a new trial. Defendants seek to cross-appeal.

The cross-appeal must be dismissed for three reasons, each justifying a dismissal, to wit: (1) cross-appel-

lants filed no notice of cross-appeal as required by Rule, on Appeal 33(3), 34A Wn. (2d) 33; (2) the judgment or order appealed from is not in the record before this court (See *State ex rel. Thomas v. Lawler,* 23 Wn. (2d) 87, 159 P. (2d) 622); and (3) cross-appellants' brief contains no assignments of error as required by Rule on Appeal 43, 34A Wn. (2d) 47, as amended, effective January 2, 1953.

Turning now to the appeal, we first will discuss a procedural matter important in this case.

██ ██ A trial court may sustain a challenge to the sufficiency of the evidence in a case tried to the court for two very different reasons:

One, the court may *disbelieve* the testimony which plaintiff introduced to prove his *prima facie* case. In such an event, the court is holding, after weighing the evidence, that *as a matter of fact* the plaintiff has not established a *prima facie* case by sufficient credible evidence. If the trial court does weigh the evidence and then makes findings of fact setting forth the facts it found to be established, this court, on appeal, will accept such findings as the established facts in the case unless the evidence clearly preponderates against such findings. *Rohda v. Boen, ante* p. 553, 276 P. (2d) 586.

██ ██ Two, the trial court may *believe* all of plaintiff's testimony but rule that, even if all of his evidence is true and granting him the most favorable inferences which may be drawn therefrom, the plaintiff has not established a *prima facie* case, and hence cannot recover. *Grichuhin v. Grichuhin,* 44 Wn. (2d) 914, 272 P. (2d) 141. In such event, the trial court is not *weighing* the evidence, but simply is holding, *as a matter of law,* that plaintiff has failed to prove a *prima facie* case and that the defendant's challenge to the sufficiency of the plaintiff's evidence must be sustained. Findings of fact are unnecessary after such a ruling, and on appeal this court will accept plaintiff's evidence as true in determining whether or not his evidence establishes a *prima facie* case. *Arneman v. Arneman,* 43 Wn. (2d) 787, 264 P. (2d) 256.

In the case at bar, the trial court, in his oral opinion pass-

ing upon the motion challenging the sufficiency of plaintiff's evidence, said:

"I am accepting all the testimony of these witnesses as true. There was nobody told any falsehoods here, I am sure of it."

Consequently, it is apparent that the trial court held *as a matter of law* (and not as a matter of fact) that plaintiff had not established a *prima facie* case, and hence his action must be dismissed. Therefore, this court will likewise treat plaintiff's evidence as true, and will determine whether he established a *prima facie* case on either of his causes of action. *Grichuhin v. Grichuhin, supra; Arneman v. Arneman, supra.*

The facts, as established by plaintiff's evidence, may be summarized thus:

Appellant has owned the northeast quarter of a section of farm land near Harrington since about 1935. Respondents acquired title to the southeast quarter of the same section in about 1945, though the property had been owned by other members of respondent husband's family for about twenty years prior to 1945. Appellant's quarter section and respondents' quarter section each contained approximately 157 acres, according to the original government survey. The true boundary line between the quarters was a line parallel to and equidistant from the north boundary of the northeast quarter section and the south boundary of the southeast quarter section.

In about 1900, a fence was erected between the quarters, but instead of being located on the true boundary, the fence was placed on a line a short distance south of the true boundary. The fence enclosed as a part of the northeast quarter a strip of land approximately a half mile long. The strip so enclosed was approximately seventy-five feet wide at the western boundary of the two quarters and approximately fifty feet wide at the eastern boundary. There was no direct testimony as to who erected the fence or why it was built. The fence remained in place until after 1912. During the years it was in place, a ridge about four or five

feet wide and a foot to eighteen inches high was created along the fence line because the owners on both sides of the fence always plowed up to the fence line.

Before 1916, the fence was removed, but a visible ridge remained, and remains to date, separating the two quarter sections. From 1922 to 1926, a tenant farmed both quarter sections, which were then (and have been ever since 1900) owned by different persons. The tenant (during the 1922-1926 period) testified that he farmed the two quarters as one unit but that he used the ridge of the old fence line as the dividing line. When he harvested the wheat from the two quarters he operated the combine in a large circle, cutting both fields at once. However, he always dumped the sacks of wheat harvested from the northeast quarter on the north side of the ridge and dumped the sacks of wheat from the southeast quarter on the south side of the ridge on each trip of the combine around the field. Consequently, the wheat from the two quarter sections was divided on the assumption that the ridge represented the boundary between the two grain fields.

In 1927, George Kloster became a tenant on the northeast quarter and has farmed it as a tenant ever since. During 1927, Kloster and Jake Schultz, brother of respondent Delmar Schultz, built a fence along the top of the ridge where the old fence had been located. Kloster built half of the fence and Jake Schultz the other half.

From 1927 to 1945, the fence remained in place, and Kloster farmed the northeast quarter down to the fence and the Schultzes farmed the southeast quarter up to the fence. In 1945, the fence was removed by Delmar Schultz with Kloster's approval, since the fence was partly down and had become a place where weeds propagated.

When Kloster started to harvest the wheat on the northeast quarter in the fall of 1945, he discovered that respondents had placed a line of posts through the wheat appellant had planted, north of the ridge line and on or near what later was determined to be the original true boundary. Kloster removed the posts and harvested the wheat up to the ridge.

Respondents then built a barbed wire fence north of the ridge, and Kloster, after being advised by appellant what to do, tore the fence out and plowed the disputed strip and put it in summer fallow. Kloster sowed the northeast quarter (including the disputed strip) to winter wheat in the fall of 1946. Before he could harvest in 1947, respondents plowed under the wheat on the disputed strip. For the next several years (1946 to 1949), Kloster and respondents "fought back and forth" over the strip. Appellant finally had the land surveyed and discovered that the original true boundary was north of the fence ridge. Appellant then commenced this action to establish his title by adverse user to the disputed strip and to recover damages for trespass.

The parties stipulated that, according to the original survey, each of the quarter sections contained 157 acres, and that the owners of each quarter had been assessed for taxes on 157 acres each for many years.

On cross-examination, Kloster testified:

"Q. Neither you nor Mr. O'Brien want any land that does not belong to you? A. I should say not. Q. And you never have? A. I never have, no. Q. What you want is the land you actually own? A. That is it."

Appellant, a man eighty-four or eighty-five years old and crippled, brought this action but did not travel from his home in Olympia to Lincoln county to testify at the trial, nor did he testify by deposition.

The second cause of action was based upon appellant's claim of title by adverse user to a strip of land extending to the center of an abandoned road which ran north and south along the eastern boundary of appellant's quarter section. Respondents also own the land east of appellant's quarter section adjoining the old road, which was abandoned by the county in 1923. Respondents' predecessors removed their fence along the old road in 1924 or 1925, and farmed the whole roadway until 1934. In that year, Kloster (appellant's tenant) removed the fence along the eastern boundary of appellant's land and put a fence down the center of the abandoned roadway from the northern boundary of ap-

pellant's land to a point more than half way down the half mile strip of the abandoned road. In 1945, respondents tore out the fence Kloster had put down the middle of the north half of the road and began farming the whole roadway again.

In passing upon respondents' motion for dismissal of the action after appellant had rested, the trial court stated that appellant had presented no testimony of any "intention" on his part to claim any lands by adverse possession. The court said:

"You haven't gotten into court at all on Mr. O'Brien's adverse possession. What testimony have you got about Mr. O'Brien having any adverse intention at all? He didn't testify. He didn't come into court. And you say he didn't come into court because he was sick. That is no excuse. This case has been pending for six months. If Mr. O'Brien intended to take this land, he should have come in here and said so. You fall flat on your nose on that particular point, because the owner himself never came in here to say he never intended, or ever intended, to take this property, and the plaintiff has the burden in this case, not the defense. The plaintiff must prove the intent to take this property, not anything else. You haven't proved it by anybody excepting Mr. Kloster, and Mr. Kloster couldn't be the agent to take some property from somebody else, that that person didn't want him to take. . . .

"There is still no proof that anybody intended to take the land. There has got to be an intention on the part of somebody to take it away from somebody, not mere possession. . . .

". . . you can't assume somebody is trying to steal something away from somebody else surreptitiously. You must prove it. . . .

"Now, how can you have hostile possession from someone unless that person knows you are taking something away from him, or unless you know you are? Certainly you can't have hostile possession without your knowing you are doing something hostile to somebody else, and there is no proof in this record that any person from 1926 down to the present time actually knew he was disseising anyone from his property or real estate, and that is the reason this statute has been interrupted in this case—that where the intention is not to hold the visible boundary unless it is in fact the true

line, the possession is not hostile; it isn't a claim of right; it isn't adverse.

"Now, there is nothing plainer than that. Unless the people know something is being taken from them, unless the people know they are taking something from somebody else, the possession is not hostile; there is no claim of right; there is no adversity.

"I can't possibly see why anyone should hold that from the reasonable inferences from the evidence that is brought before us here, there was anything but a mutual mistake, because the testimony shows by Mr. O'Brien's own man that he never intended to adversely divest anyone of his ownership of property. Mr. O'Brien accepted the crops because he believed that crops raised on that land were his, raised on his land. That is the only reasonable inference we can have in the absence of the plaintiff's own statement, and by plaintiff I mean Mr. O'Brien, as to his intention in receiving crops. The fact he took crops was merely because he had this land and thought it was his. He didn't know it wasn't his until 1945."

The essence of the trial court's reasoning is (1) that the fence had been located in the wrong place as the result of a mutual mistake; (2) that appellant had not proved any intention to hold the land adversely because he did not testify that he knew he was using the 3¾ acres of respondents' land and had at all times intended to claim it; (3) that appellant's lack of hostile intention to claim the disputed strip was shown by the testimony that he did not intend to claim any land that was not his own; (4) that respondents did not know that appellant was using their land and they had to know before his use could be adverse, and (5) that in any event appellant could not acquire title by adverse possession through the acts of his agent, Kloster.

■■ *Brown v. Hubbard,* 42 Wn. (2d) 867, 259 P. (2d) 391, and *Beck v. Loveland,* 37 Wn. (2d) 249, 222 P. (2d) 1066, were cited by the trial court as the authority for its holding in this case. Both cases cite and recognize the rule that possession originating in a mistake in the location of a fence may become adverse, but that the character of the possession is a question of fact (not a question of law to be determined simply because there was a mistake in locating

a boundary line). Consequently, as to point (1), the fact that the fence between the parties' lands apparently was located where it was by mistake, would not preclude appellant from recovering in this action if he had the necessary intention to claim the land he was using up to the fence. *Taylor v. Talmadge, ante* p. 144, 273 P. (2d) 506.

As to point (2) and point (3), both dealing with the intention necessary to create a title by adverse possession, neither *Brown v. Hubbard, supra,* nor *Beck v. Loveland, supra,* lay down the rules contended for by respondents and accepted by the trial court. On the contrary, we had on several occasions, prior to the *Brown* and *Beck* cases, held that *an express declaration of intention* to claim land adversely to the true owner is not necessary to initiate the running of the statutory period nor to support an action to establish title by adverse possession. *Mittet v. Hansen,* 178 Wash. 541, 35 P. (2d) 93; *Foote v. Kearney,* 157 Wash. 681, 290 Pac. 226; *Johnson v. Ingram,* 63 Wash. 554, 115 Pac. 1073; *Schlossmacher v. Beacon Place Co.,* 52 Wash. 588, 100 Pac. 1013. Nothing said in either *Brown v. Hubbard, supra,* nor in *Beck v. Loveland, supra,* changed, or was intended to change, the foregoing rule.

In the *Brown* case, plaintiff sought to establish his title by adverse user to a strip of land eight and a half feet wide adjoining the south boundary of his lot in a residential district. About twelve years before the dispute over the strip arose, plaintiff's predecessor attempted to define a boundary line by haphazardly piling rocks along part of the line, by planting some bushes on another part, and by putting the fence of a chicken or rabbit pen along another part of the line. There was a serious question of fact whether the line established sufficiently marked a boundary to give notice to a prudent owner that plaintiff was holding the disputed strip with an intention to claim the land. It should be noted that there were no permanent visible improvements (buildings) on the disputed strip to give unequivocal notice of his apparent intention to claim title.

The trial court's findings of fact in the *Brown* case found, in effect, that the nature of plaintiff's acts in using the disputed strip, together with his declarations (as soon as the mistake was discovered) that he would vacate the strip, did not clearly indicate that he had occupied the strip with the hostile intention of claiming it as an owner. We agreed that the evidence did not preponderate against the trial court's findings so as to justify a reversal. To demonstrate that the trial court in that case was correct in finding a lack of hostile intention, we set out testimony indicating that plaintiff did not at first claim the strip, and testimony indicating that he and his predecessors never had intended to claim anything beyond his true boundary. The real basis of our opinion, however (namely, that we could not find *on the whole record* that the evidence preponderated against the findings), is shown in the next to last sentence, which reads:

"However, the record amply supports the finding of the trial court that appellants and their predecessors in interest did not claim or intend to claim as owners beyond the true boundary line for the statutory period required to vest title in them by adverse posession."

We did not, in that case, consider as controlling the testimony of plaintiff and his predecessor that they did not intend to claim anything beyond the true boundary. Indeed, we could not have done so, inasmuch as in three earlier decisions we had held that almost identical language did not, by itself, prove a lack of intention to claim title by adverse possession. See *Mittet v. Hansen, supra, Johnson v. Ingram, supra,* and *Schlossmacher v. Beacon Place Co., supra.* There is no magic formula by which a claim of title by adverse possession may be defeated by drawing from the claimant an admission that originally he did not intend to take any land beyond his boundaries.

*Beck v. Loveland, supra,* the second case relied on by respondents here in support of the trial court's rulings on points (2) and (3), held no more than that, when a person uses property up to a fence which he *knows* is not the boundary and which he *agrees* to treat as a temporary boundary

until the true boundary is established by a survey, his possession will not be held to be hostile as against the true owner.

In no decision has this court ever held that one who claims title by adverse possession must appear in court and testify that he knew he was using his neighbor's land and that he intended to claim it if his plot was not discovered before the statutory period had run.

Courts have had considerable difficulty in determining "intention" in adverse possession cases, because intention may be evidenced (1) by the *acts* of a party, or (2) by his *declarations*. See 97 A. L. R. 14-114. Some jurisdictions look primarily to the *acts* of the user of land, ignoring his *declarations* made after the statutory period has run. Other jurisdictions largely ignore his *acts* and require an express *declaration* that he always intended to claim another's land, and hold that a user's *declaration* that he did *not* intend to claim land not his own defeats his claim to title by adverse possession.

Still other jurisdictions, including ours, look to the *acts and declarations* of the user. *Bowers v. Ledgerwood,* 25 Wash. 14, 64 Pac. 936; *Brown v. Hubbard, supra.* In jurisdictions such as ours, the *acts* of the user most frequently control. If his *acts* clearly evince an intention to claim land as its owner, a general *declaration* by the user that he did not intend to claim another's land will not prove lack of intention. *Mittet v. Hansen, supra.* But a specific *declaration* by a user that he knew a fence was not the boundary and that he agreed to consider it as a temporary barrier will prove lack of intention. *Beck v. Loveland, supra.* And if his *acts* are equivocal or do not clearly evince his intention to claim as owner, his *declaration* that he did not intend to take another's land, though not conclusive proof of lack of intention, may be considered in determining his intention while using the land. *Brown v. Hubbard, supra; Carroll v. Rabberman,* 240 Ill. 450, 88 N. E. 995.

The testimony in the case at bar strongly indicates that the fence erected in about 1900 and the ridge created along

the fence was recognized by all owners for more than forty years as the boundary line. From 1922 to 1945, the testimony shows that the ridge, and later the second fence, were used by both parties as the boundary, and that during that period appellant and his predecessors always farmed the disputed strip and took the crops·from it.

■■■ ·This is one of those cases in which it may be said that "actions speak louder than words." By exercising full dominion and control over the strip for more than twenty years, during which time they took the crops from the land, the appellant and his predecessors *clearly evinced their intention to claim the strip* as against the whole world, including the owner of the legal title. *Lindley v. Johnston,* 42 Wash. 257, 84 Pac. 822.

We hold that the trial court was in error in holding as to points (2) and (3) that appellant had not proven a *prima facie* case as to his intention to claim the land adversely to the true owners.

■■■ In point (4), the trial court held respondents had to "know" that appellant was using their land before his use became adverse. We said in *Bowers v. Ledgerwood,* 25 Wash. 14, 64 Pac. 936, quoting from *McAuliff v. Parker,* 10 Wash. 141, 38 Pac. 744, that

" 'All the authorities hold that the question of adverse possession is a question of fact, and it must be a possession that is *known* to the owner of the legal title.' " (Italics ours.)

The foregoing quotation appears to be the basis of the trial court's conclusion in this case that the respondents had to "know" that appellant was using their land before his use became adverse. Immediately after the foregoing quoted matter in the *McAuliff* case, this sentence appears:

"If there is direct proof that the owner of the legal title knew of the adverse possession, it is not necessary to go further, *but the presumption is that if the adverse possession is open and notorious the owner of the title will know it."* (Italics ours.)

· In the case at bar, appellant and his predecessors held the disputed strip openly and notoriously. The respondents

and their predecessors will be presumed to have known that fact. Therefore, the ruling of the trial court was erroneous as to point (4).

 The trial court held in point (5) that appellant could not acquire title by adverse possession through a tenant as agent. We held exactly to the contrary in *Foote v. Kearney*, 157 Wash. 681, 290 Pac. 226, in which we said:

" 'What a man may do himself, in the matter of taking and holding possession of real estate, he may do by another.' "

 We hold that, as to the disputed strip along the southern boundary of appellant's quarter section, his evidence clearly established a *prima facie* case which would entitle him to a decree establishing his title by adverse possession, unless the respondents can successfully rebut his *prima facie* case by the evidence presented in support of their defense.

On the second cause of action, the trial court held that appellant could not establish his title by adverse possession to a half of the abandoned road along the eastern boundary of his property because he had shown no intention to claim the western half of the road adversely. We are constrained to hold that this ruling was erroneous for the reasons heretofore stated in regard to the first cause of action. The court also held, however, that appellant could not establish his title to the strip in the old roadway because there was no testimony to show whether the road had been owned in fee simple by the county or whether it only had an easement.

It is immaterial in this action what claims the county may have to the strip once used as a road. The county is not a party to the action, and no judgment or decree will, in this case, affect its rights, if any.

 We have held that title to part of a dedicated public street or road cannot be acquired by adverse possession. *Mueller v. Seattle*, 167 Wash. 67, 8 P. (2d) 994. But we also have held that title to an abandoned street may be acquired by adverse possession. *Lewis v. Seattle*, 174 Wash. 219, 24 P. (2d) 427, 27 P. (2d) 1119.

The testimony stands undisputed in this case that the road has been abandoned since 1923, and that either appellant and his predecessors or respondents and their predecessors have farmed most of the abandoned road since that date. Appellant's testimony establishes that his tenant for more than ten years had fenced and farmed the west half of the abandoned roadway from the northern boundary of appellant's quarter section to a point more than half way down to the southern boundary of the quarter section. That testimony, taken as true (as it must be for our present purposes), *prima facie* establishes appellant's right to his title by adverse possession to that part of the road formerly enclosed by his fence.

The judgment is reversed on both causes of action, and the cause is remanded with instructions to grant appellant's motion for a new trial. For the reasons heretofore mentioned, the cross-appeal is dismissed.

GRADY, C. J., SCHWELLENBACH, HILL, and WEAVER, JJ., concur.

_____

February 2, 1955. Petition for rehearing denied.